

FILED

JUL - 9 2008

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY                          DEPUTY

1
2
3
4
5
6
7
8        UNITED STATES DISTRICT COURT

9        SOUTHERN DISTRICT OF CALIFORNIA

10  IN THE MATTER OF THE EXTRADITION    )

11              OF                      )    No. '08 MJ 2080

12  ANTHONY REYNOLDS                    )

13  _____   )

14                      COMPLAINT

15       I, Robert Ciaffa, being duly sworn, depose and state that I am

16  an Assistant United States Attorney for the Southern District of

17  California and act for and on behalf of the Government of Canada

18  pursuant to an Extradition Treaty, as amended by Protocols, in force

19  between the United States

20  and Canada, 27 UST 983, TIAS 8237 (the Treaty) with respect to Anthony

21  Reynolds (the fugitive).

22       In accordance with Title 18, United States Code, Section 3184,

23  I charge, on information and belief, as follows:

24       1. Foreign charge(s). The fugitive is duly and legally charged

25  with having committed, in the jurisdiction of the Requesting State,

26  the crime(s) of: Attempted murder, Criminal Code of Canada, Section

27  239; Attempted murder while using a firearm, Criminal Code of Canada,

28  Section 239(a); Aggravated assault, Criminal Code of Canada, Section

1  268; Discharge firearm endanger life, Criminal Code of Canada, Section
2  244(b); Assault with a weapon, Criminal Code of Canada, Section
3  267(a); Pointing a firearm, ·Criminal Code of Canada, Section 87; Use
4  of firearm while committing indictable offense of aggravated assault,
5  Criminal Code of Canada, Section 85; and Use of firearm while
6  committing indictable offense of assault with a weapon, Criminal Code
7  of Canada, Section 85.  Article 2 of the Treaty, as amended by the
8  Protocols, provides that a charge for such offense(s) shall serve as
9  the basis for extradition.

10     2. Foreign arrest warrant.  A warrant for the fugitive's arrest
11  was issued on May 4, 2006, by a Justice of the Peace in and for the
12  Province of Ontario.

13     3. Facts underlying foreign charge(s).     According to an
14  investigation by authorities of the Requesting State, Felix Twum
15  (hereinafter the "victim") was involved in selling a used car to
16  Anthony REYNOLDS, the accused, (who the victim knew as Oval THOMPSON).
17  The deal fell through and the victim refused to refund $500 to
18  REYNOLDS, who wanted the money back.  Subsequently, on December 19,
19  2005, the two got into a physical altercation about the money and the
20  victim hit REYNOLDS several times in the face.  Three days later, on
21  December 22, 2005, REYNOLDS drove up to the victim, said "fuck you"
22  and shot him with a handgun.  The victim tried to reach his own
23  vehicle but REYNOLDS shot him again.  REYNOLDS then fled the scene in
24  a black SUV, leaving the victim lying in the street.

25     The Toronto police received information that "Oval THOMPSON's"
26  real name was Anthony REYNOLDS.  The victim was able to select
27  REYNOLDS' driver's license picture from a photograph line-up as the
28  man who shot him.  Other witnesses also identified REYNOLDS' picture

1  as that of the man they knew as Oval THOMPSON, who was involved in the
2  used car transaction with the victim.
3      The police located a total of two 9mm shell casings and three 9mm
4  projectiles and one copper jacket at the scene of the crime,
5  suggesting that at least three shots were fired.
6      The victim was shot two or three times but no bullets lodged in
7  his body.  He is now a paraplegic, lost a kidney and has damage to his
8  lungs and liver.
9      4. <u>Fugitive's presence in the U.S.</u>  The fugitive, who is
10 within the jurisdiction of this Court, may be found at the San
11 Ysidro, California, Port of Entry.  He attempted to enter the
12 United States on July 9, 2008, using a United States passport in
13 the name of Anthony Augustus Reynolds, with a date of birth of
14 September 22, 1977.
15     5. <u>Fugitive's description</u>. The fugitive, also known as Oval
16 Thompson, is a naturalized citizen of the United States, born on
17 September 22, 1977 in Jamaica.   He is described as a black male,
18 with brown eyes and black hair.  Canadian authorities have
19 submitted photographs of the fugitive which are attached hereto.
20     6. <u>Provisional arrest request</u>.  Article 11 of the Treaty
21 provides for provisional arrest of a fugitive pending receipt of
22 the regular diplomatic request for extradition and accompanying
23 documents.  The government of the Requesting State has formally
24 requested that the fugitive be provisionally arrested for
25 extradition.
26     7. <u>Extradition request</u>. I am informed through the diplomatic
27 channels (or by the Ministry of Justice or the Ministry of Foreign
28 Affairs) that the Requesting State will make a regular diplomatic

3

1  request for extradition of the fugitive in conformity with the

2  Treaty and will present the completed papers upon which the demand

3  for extradition is founded within sixty days, as required by

4  Article 11 of the Treaty, as amended by the Protocols.

5      Whereupon, your complainant requests:

6      a. that a warrant be issued pursuant to Title 18, United

7  States Code, Section 3184, for the fugitive's arrest;

8      b. that the fugitive be brought before this Court and the

9  evidence of criminality be heard;

10      c. that if, on such hearing, the Court deems the evidence

11  sufficient under the provisions of the Treaty to sustain the

12  charge(s), the Court certify the same to the Secretary of State in

13  order that a warrant may be issued for the surrender of the

14  fugitive to the appropriate authorities of the Requesting State

15  according to the Treaty; and

16      d. that this Court take such other actions as may be required

17  under the provisions of the Treaty and the laws of the United

18  States to meet the obligations of the United States under the

19  Treaty, including the seizure of any items or materials in the

20  fugitive's possession at the time of apprehension which are related

21  to the crimes charged or which may be used as evidence, pursuant to

22  the Treaty and its Protocols.

23  //

24  //

25  //

26  //

27  //

28  //

4

1  Attachments:
   Extradition Treaty
2  Affidavit of Janet Gallin, Crown Prosecutor
   Affidavit of Darren Townley, Detective, Toronto Police Service
3  Exhibits A-G

4
           DATED AT San Diego, California, this 9th day of July 2008.
5
                              Respectfully submitted,
6
                              KAREN P. HEWITT
7                             United States Attorney

8

9                             ROBERT CIAFFA
                              Assistant United States Attorney
10

11

12
           Sworn to before me this  9th  day of July 2008, AND A WARRANT
13  SHALL ISSUE.

14

15                       United States Magistrate Judge

16

17

18

19

20

21

22

23

24

25

26

27

28

## TREATIES AND OTHER INTERNATIONAL ACTS SERIES 8237

# EXTRADITION

Treaty Between the
UNITED STATES OF AMERICA
and CANADA

Signed at Washington December 3, 1971

*and*

Agreement Amending the Treaty
Effected by Exchange of Notes
Signed at Washington June 28 and July 9, 1974



# CANADA

## Extradition

*Treaty signed at Washington December 3, 1971;*
*And agreement amending the treaty*
*Effected by exchange of notes*
*Signed at Washington June 28 and July 9, 1974;*
*Ratification of the treaty, as amended, advised by the Senate of*
*the United States of America December 1, 1975;*
*Ratified by the President of the United States of America De-*
*cember 12, 1975;*
*Ratified by Canada February 2, 1976;*
*Ratifications exchanged at Ottawa March 22, 1976;*
*Proclaimed by the President of the United States of America*
*May 6, 1976;*
*Entered into force March 22, 1976.*

———————

By the President of the United States of America

## A PROCLAMATION

Considering that:

The Treaty on Extradition between the United States of America and Canada was signed at Washington on December 3, 1971, as amended by an exchange of notes on June 28 and July 9, 1974, the original of which Treaty, as amended, is hereto annexed;

The Senate of the United States of America by its resolution of December 1, 1975, two-thirds of the Senators present concurring therein, gave its advice and consent to ratification of the Treaty, as amended;

The Treaty was ratified by the President of the United States of America on December 12, 1975, in pursuance of the advice and consent of the Senate, and has been duly ratified on the part of Canada;

The respective instruments of ratification were exchanged at Ottawa on March 22, 1976;

It is provided in Article 18 of the Treaty that the Treaty shall enter into force upon the exchange of ratifications;

Now, therefore, I, Gerald R. Ford, President of the United States of America, proclaim and make public the Treaty, as amended,

(1)                                TIAS 8237

2

to the end that it shall be observed and fulfilled with good faith on and after March 22, 1976, by the United States of America and by the citizens of the United States of America and all other persons subject to the jurisdiction thereof.

IN TESTIMONY WHEREOF, I have signed this proclamation and caused the Seal of the United States of America to be affixed.

DONE at the city of Washington this sixth day of May in the year of our Lord one thousand nine hundred seventy-six [SEAL] and of the Independence of the United States of America the two hundredth.

GERALD R. FORD

By the President:
    JOSEPH JOHN SISCO
        *Acting Secretary of State*

TIAS 8237

3

TREATY ON EXTRADITION BETWEEN
THE UNITED STATES OF AMERICA
AND CANADA

The United States of America and Canada, desiring to make
more effective the cooperation of the two countries in the
repression of crime by making provision for the reciprocal
extradition of offenders, agree as follows:

TIAS 8237

4

## ARTICLE 1

Each Contracting Party agrees to extradite to the other, in the circumstances and subject to the conditions described in this Treaty, persons found in its territory who have been charged with, or convicted of, any of the offenses covered by Article 2 of this Treaty committed within the territory of the other, or outside thereof under the conditions specified in Article 3(3) of this Treaty.

## ARTICLE 2

(1)  Persons shall be delivered up according to the provisions of this Treaty for any of the offenses listed in the Schedule annexed to this Treaty, which is an integral part of this Treaty, provided these offenses are punishable by the laws of both Contracting Parties by a term of imprisonment exceeding one year.

(2)  Extradition shall also be granted for attempts to commit, or conspiracy to commit or being a party to any of the offenses listed in the annexed Schedule.

(3)  Extradition shall also be granted for any offense against a federal law of the United States in which one of the offenses listed in the annexed Schedule, or made extraditable by paragraph (2) of this Article, is a substantial element, even if transporting, transportation, the use of the mails or interstate facilities are also elements of the specific offense.

## ARTICLE 3

(1)  For the purpose of this Treaty the territory of a Contracting Party shall include all territory under the jurisdiction of that Contracting Party, including air space

TIAS 8237

5

and territorial waters and vessels and aircraft registered in that Contracting Party or aircraft leased without crew to a lessee who has his principal place of business, or, if the lessee has no such place of business, his permanent residence in, that Contracting Party if any such aircraft is in flight, or if any such vessel is on the high seas when the offense is committed. For the purposes of this Treaty an aircraft shall be considered in flight from the moment when power is applied for the purpose of the take-off until the moment when the landing run ends.

(2)  In a case when offense 23 of the annexed Schedule is committed on board an aircraft at any time from the moment when all its external doors are closed following embarkation until the moment when any such door is opened for disembarkation, such offense and any other offense covered by Article 2 committed against passengers or crew of that aircraft in connection with such offense shall be considered to have been committed within the territory of a Contracting Party if the aircraft was registered in that Contracting Party, if the aircraft landed in the territory of that Contracting Party with the alleged offender still on board, or if the aircraft was leased without crew to a lessee who has his principal place of business, or, if the lessee has no such place of business, his permanent residence in that Contracting Party.

(3)  When the offense for which extradition has been requested has been committed outside the territory of the requesting State, the executive or other appropriate authority of the requested State shall have the power to grant the extradition if the laws of the requested State provide for jurisdiction over such an offense committed in similar circumstances.

TIAS 8237

6

## ARTICLE 4

(1)  Extradition shall not be granted in any of the following circumstances:

(i)  When the person whose surrender is sought is being proceeded against, or has been tried and discharged or punished in the territory of the requested State for the offense for which his extradition is requested.

(ii) When the prosecution for the offense has become barred by lapse of time according to the laws of the requesting State.

(iii) When the offense in respect of which extradition is requested is of a political character, or the person whose extradition is requested proves that the extradition request has been made for the purpose of trying or punishing him for an offense of the above-mentioned character.  If any question arises as to whether a case comes within the provisions of this subparagraph, the authorities of the Government on which the requisition is made shall decide.

(2)  The provisions of subparagraph (iii) of paragraph (1) of this Article shall not be applicable to the following:

(i)  A kidnapping, murder or other assault against the life or physical integrity of a person to whom a Contracting Party has the duty according to international law to give special protection, or any attempt to commit such an offense with respect to any such person.

(ii) When offense 23 of the annexed Schedule, or an attempt to commit, or a conspiracy to commit, or being a party to the commission of that offense, has been committed  on board an aircraft engaged in commercial services carrying passengers.

TIAS 8237

7

### ARTICLE 5

If a request for extradition is made under this Treaty for a person who at the time of such request, or at the time of the commission of the offense for which extradition is sought, is under the age of eighteen years and is considered by the requested State to be one of its residents, the requested State, upon a determination that extradition would disrupt the social readjustment and rehabilitation of that person, may recommend to the requesting State that the request for extradition be withdrawn, specifying the reasons therefor.

### ARTICLE 6

When the offense for which extradition is requested is punishable by death under the laws of the requesting State and the laws of the requested State do not permit such punishment for that offense, extradition may be refused unless the requesting State provides such assurances as the requested State considers sufficient that the death penalty shall not be imposed, or, if imposed, shall not be executed.

### ARTICLE 7

When the person whose extradition is requested is being proceeded against or is serving a sentence in the territory of the requested State for an offense other than that for which extradition has been requested, his surrender may be deferred until the conclusion of the proceedings and the full execution of any punishment he may be or may have been awarded.

TIAS 8237

8

### ARTICLE 8

The determination that extradition should or should not be granted shall be made in accordance with the law of the requested State and the person whose extradition is sought shall have the right to use all remedies and recourses provided by such law.

### ARTICLE 9

(1)  The request for extradition shall be made through the diplomatic channel.

(2)  The request shall be accompanied by a description of the person sought, a statement of the facts of the case, the text of the laws of the requesting State describing the offense and prescribing the punishment for the offense, and a statement of the law relating to the limitation of the legal proceedings.

(3)  When the request relates to a person who has not yet been convicted, it must also be accompanied by a warrant of arrest issued by a judge or other judicial officer of the requesting State and by such evidence as, according to the laws of the requested State, would justify his arrest and committal for trial if the offense had been committed there, including evidence proving the person requested is the person to whom the warrant of arrest refers.

(4)  When the request relates to a person already convicted, it must be accompanied by the judgment of conviction and sentence passed against him in the territory of the requesting State, by a statement showing how much of the sentence has not been served, and by evidence proving that the person requested is the person to whom the sentence refers.

TIAS 8237

9

## ARTICLE 10

(1)  Extradition shall be granted only if the evidence be found sufficient, according to the laws of the place where the person sought shall be found, either to justify his committal for trial if the offense of which he is accused had been committed in its territory or to prove that he is the identical person convicted by the courts of the requesting State.

(2)  The documentary evidence in support of a request for extradition or copies of these documents shall be admitted in evidence in the examination of the request for extradition when, in the case of a request emanating from Canada, they are authenticated by an officer of the Department of Justice of Canada and are certified by the principal diplomatic or consular officer of the United States in Canada, or when, in the case of a request emanating from the United States, they are authenticated by an officer of the Department of State of the United States and are certified by the principal diplomatic or consular officer of Canada in the United States.

## ARTICLE 11

(1)  In case of urgency a Contracting Party may apply for the provisional arrest of the person sought pending the presentation of the request for extradition through the diplomatic channel. Such application shall contain a description of the person sought, an indication of intention to request the extradition of the person sought and a statement of the existence of a warrant of arrest or a judgment of conviction against that person, and such further information, if any, as would be necessary to justify the issue of a warrant of arrest had the offense been committed, or the person sought been convicted, in the territory of the requested State.

TIAS 8237

10

(2)  On receipt of such an application the requested State shall take the necessary steps to secure the arrest of the person claimed.

(3)  A person arrested shall be set at liberty upon the expiration of forty-five days from the date of his arrest pursuant to such application if a request for his extradition accompanied by the documents specified in Article 9 shall not have been received.  This stipulation shall not prevent the institution of proceedings with a view to extraditing the person sought if the request is subsequently received.

ARTICLE 12

(1)  A person extradited under the present Treaty shall not be detained, tried or punished in the territory of the requesting State for an offense other than that for which extradition has been granted nor be extradited by that State to a third State unless:

(i)  He has left the territory of the requesting State after his extradition and has voluntarily returned to it;

(ii) He has not left the territory of the requesting State within thirty days after being free to do so; or

(iii) The requested State has consented to his detention, trial, punishment for an offense other than that for which extradition was granted or to his extradition to a third State, provided such other offense is covered by Article 2.

(2)  The foregoing shall not apply to offenses committed after the extradition.

TIAS 8237

11

### ARTICLE 13

(1)  A requested State upon receiving two or more requests for the extradition of the same person either for the same offense, or for different offenses, shall determine to which of the requesting States it will extradite the person sought.

(2)  Among the matters which the requested State may take into consideration are the possibility of a later extradition between the requesting States, the seriousness of each offense, the place where the offense was committed, the dates upon which the requests were received and the provisions of any extradition agreements between the requested State and the other requesting State or States.

### ARTICLE 14

(1)  The requested State shall promptly communicate to the requesting State through the diplomatic channel the decision on the request for extradition.

(2)  If a warrant or order for the extradition of a person sought has been issued by the competent authority and he is not removed from the territory of the requested State within such time as may be prescribed by the laws of that State, he may be set at liberty and the requested State may subsequently refuse to extradite that person for the same offense.

### ARTICLE 15

(1)  To the extent permitted under the law of the requested State and subject to the rights of third parties, which shall be duly respected, all articles acquired as a result of the offense or which may be required as evidence shall, if found, be surrendered to the requesting State if extradition is granted.

**TIAS 8237**

12

(2)  Subject to the qualifications of paragraph (1) of this Article, the above-mentioned articles shall be returned to the requesting State even if the extradition, having been agreed to, cannot be carried out owing to the death or escape of the person sought.


### ARTICLE 16

(1)  The right to transport through the territory of one of the Contracting Parties a person surrendered to the other Contracting Party by a third State shall be granted on request made through the diplomatic channel, provided that conditions are present which would warrant extradition of such person by the State of transit and reasons of public order are not opposed to the transit.

(2)  The Party to which the person has been extradited shall reimburse the Party through whose territory such person is transported for any expenses incurred by the latter in connection with such transportation.


### ARTICLE 17

(1)  Expenses related to the transportation of the person sought to the requesting State shall be paid by the requesting State.  The appropriate legal officers of the State in which the extradition proceedings take place shall, by all legal means within their power, assist the requesting State before the respective judges and magistrates.

13

(2)  No pecuniary claim, arising out of the arrest, detention, examination and surrender of persons sought under the terms of this Treaty, shall be made by the requested State against the requesting State.

ARTICLE 18

(1)  This Treaty shall be ratified and the instruments of ratification shall be exchanged at Ottawa as soon as possible.

(2)  This Treaty shall terminate and replace any extradition agreements and provisions on extradition in any other agreement in force between the United States and Canada; except that the crimes listed in such agreements and committed prior to entry into force of this Treaty shall be subject to extradition pursuant to the provisions of such agreements.

(3)  This Treaty shall enter into force upon the exchange of ratifications.[1] It may be terminated by either Contracting Party giving notice of termination to the other Contracting Party at any time and the termination shall be effective six months after the date of receipt of such notice.

---

[1] Mar. 22, 1976.

TIAS 8237

14

IN WITNESS WHEREOF the undersigned, being duly authorized thereto by their respective Governments, have signed this Treaty.

DONE in duplicate, in the English and French languages, each language version being equally authentic, at Washington this third day of December, one thousand nine hundred seventy one.

FOR THE UNITED STATES OF AMERICA:

*[signature]* [1]

FOR CANADA:

*[signature]* [2]

---

[1] William P. Rogers
[2] Mitchell Sharp

TIAS 8287

15

## SCHEDULE

1.  Murder; assault with intent to commit murder.

2.  Manslaughter.

3.  Wounding; maiming; or assault occasioning bodily harm.

4.  Unlawful throwing or application of any corrosive substances
    at or upon the person of another.

5.  Rape; indecent assault.

6.  Unlawful sexual acts with or upon children under the age
    specified by the laws of both the requesting and requested
    States.

7.  Willful nonsupport or willful abandonment of a minor when
    such minor is or is likely to be injured or his life is or
    is likely to be endangered.

8.  Kidnapping; child stealing; abduction; false imprisonment.

9.  Robbery; assault with intent to steal.

10. Burglary; housebreaking.

11. Larceny, theft or embezzlement.

12. Obtaining property, money or valuable securities by false
    pretenses or by threat of force or by defrauding the public
    or any person by deceit or falsehood or other fraudulent
    means, whether such deceit or falsehood or any fraudulent
    means would or would not amount to a false pretense.

13. Bribery, including soliciting, offering and accepting.

14. Extortion.

16

15. Receiving any money, valuable securities or other property knowing the same to have been unlawfully obtained.

16. Fraud by a banker, agent, or by a director or officer of any company.

17. Offenses against the laws relating to counterfeiting or forgery.

18. Perjury in any proceeding whatsoever.

19. Making a false affidavit or statutory declaration for any extrajudicial purpose.

20. Arson.

21. Any act done with intent to endanger the safety of any person travelling upon a railway, or in any aircraft or vessel or other means of transportation.

22. Piracy, by statute or by law of nations; mutiny or revolt on board a vessel against the authority of the captain or commander of such vessel.

23. Any unlawful seizure or exercise of control of an aircraft, by force or violence or threat of force or violence, or by any other form of intimidation, on board such aircraft.

24. Willful injury to property.

25. Offenses against the bankruptcy laws.

26. Offenses against the laws relating to the traffic in, production, manufacture, or importation of narcotic drugs, Cannabis sativa L., hallucinogenic drugs, amphetamines, barbiturates, cocaine and its derivatives.

17

27. Use of the mails or other means of communication in connection with schemes devised or intended to deceive or defraud the public or for the purpose of obtaining money or property by false pretenses.

28. Offenses against federal laws relating to the sale or purchase of securities.

29. Making or having in possession any explosive substance with intent to endanger life, or to cause severe damage to property.

30. Obstructing the course of justice in a judicial proceeding, existing or proposed, by:

   a)   dissuading or attempting to dissuade a person by threats, bribes, or other corrupt means from giving evidence;

   b)   influencing or attempting to influence by threat, bribes, or other corrupt means a person in his conduct as a juror; or

   c)   accepting a bribe or other corrupt consideration to abstain from giving evidence or to do or to refrain from doing anything as a juror.

TIAS 8237

35

[AMENDING AGREEMENT]

*The Canadian Ambassador to the Secretary of State*



Canadian Embassy                                        Ambassade du Canada

Washington, D.C.

June 28, 1974

No. 126

Excellency,

      I have the honour to refer to the Treaty on Extra-
dition between the Government of Canada and the Government
of the United States signed at Washington on December 3,
1971 and to subsequent discussions between representatives
of our two governments concerning the amendment of the said
Treaty.

      Further to those discussions I now have the honour
to propose that the said Treaty be amended as follows:

        (1) That Article 4(2)(i) of the Treaty shall
           be amended to read:  "A kidnapping, murder,
           or other assault against the life or physical
           integrity of a person to whom a Contracting
           Party has the duty according to international
           law to give special protection, or any attempt
           or conspiracy to commit, or being a party to

The Honourable
  Henry A. Kissinger,
    Secretary of State,
      Washington, D.C.
        20520

TIAS 8237

36

the commission of, such an offence with
respect to any such person."

(?) That clause 26 of the Schedule annexed to
the Treaty shall be amended to read:
"Offences against the laws relating to
the traffic in, production, manufacture or
importation of drugs listed in Schedule I
to the Single Convention on Narcotic Drugs
of March 30, 1961[1] and of drugs listed in
Schedules I, II and III to the Convention
on Psychotropic Substances of February 21,
1971."

If this proposal meets with the approval of your
government, I have the further honour to propose that
this Note, which is authentic in English and in French,
and your reply shall constitute an amendment to the Treaty
on Extradition between Canada and the United States referred
to above, which shall come into force on the date of the
entry into force of the said Treaty and which shall be con-
sidered an integral part of the said Treaty.

Accept, Excellency, the assurances of my highest
consideration.

M. Cadieux,
Ambassador.

[1] TIAS 6298; 18 UST 1559.

TIAS 8237

| 101ST CONGRESS 2d Session | SENATE | TREATY DOC. 101-17 |
| --- | --- | --- |

# PROTOCOL AMENDING THE EXTRADITION TREATY WITH CANADA

## MESSAGE

FROM

# THE PRESIDENT OF THE UNITED STATES

TRANSMITTING

THE PROTOCOL SIGNED AT OTTAWA ON JANUARY 11, 1988, AMENDING THE TREATY ON EXTRADITION BETWEEN THE UNITED STATES OF AMERICA AND CANADA, SIGNED AT WASHINGTON ON DECEMBER 3, 1971, AS AMENDED BY AN EXCHANGE OF NOTES ON JUNE 28 AND JULY 9, 1974



APRIL 24, 1990.—Protocol was read the first time, and together with the accompanying papers, referred to the Committee on Foreign Relations and ordered to be printed for the use of the Senate

U.S. GOVERNMENT PRINTING OFFICE

WASHINGTON : 1990

39-118

## LETTER OF TRANSMITTAL

———————

THE WHITE HOUSE, *April 24, 1990.*

*To the Senate of the United States:*

With a view to receiving the advice and consent of the Senate to ratification, I transmit herewith the Protocol signed at Ottawa on January 11, 1988, amending the Treaty on Extradition Between the United States of America and Canada, signed at Washington on December 3, 1971, as amended by an exchange of notes on June 28 and July 9, 1974. I transmit also, for the information of the Senate, the report of the Department of State with respect to the protocol.

The protocol amends the Extradition Treaty Between the United States and Canada, signed at Washington on December 3, 1971, as amended by an exchange of notes on June 28 and July 9, 1974. It represents an important step in improving law enforcement cooperation and combatting terrorism by excluding from the scope of the political offense exception serious offenses typically committed by terrorists; e.g., murder, manslaughter, kidnapping, use of an explosive device capable of endangering life or causing grievous bodily harm, and attempt or conspiracy to commit the foregoing offenses.

The protocol also will help to improve implementation of the current extradition treaty in several other respects. Most significant, the protocol substitutes a dual criminality clause for the current list of extraditable offenses, so that, *inter alia,* parental child abduction and certain additional narcotics offenses will be covered by the new treaty.

I recommend that the Senate give early and favorable consideration to the protocol and give its advice and consent to ratification.

GEORGE BUSH.

(III)

LETTER OF SUBMITTAL

DEPARTMENT OF STATE,
*Washington, April 10, 1990.*

The PRESIDENT,
*The White House.*

THE PRESIDENT: I have the honor to submit to you the Protocol amending the 1971 Extradition Treaty Between the United States of America and Canada signed at Ottawa January 11, 1988. I recommend that the Protocol be transmitted to the Senate for advice and consent to ratification.

The Protocol supplements and amends the Extradition Treaty Between the United States and Canada, signed at Washington on December 3, 1971, as amended by an exchange of notes on June 28 and July 9, 1974 (27 U.S.T. 983; TIAS 8237). The Protocol would exclude specified crimes of violence, typically committed by terrorists, from the scope of the political offense exception to extradition. It therefore represents an important step toward improving law enforcement cooperation and countering the threat of international terrorism and other crimes of violence. In addition, the Protocol will help improve the implementation of the current Treaty in several other respects. Most significantly, the Protocol substitutes a dual criminality clause for the current list of extraditable offenses, so that, inter alia, parental child abduction and certain additional narcotics offenses will be covered.

Article 2 of the 1971 Extradition Treaty, as amended, which incorporates a Schedule of extraditable offenses, has been replaced in its entirety. Pursuant to the current Extradition Treaty, only crimes that are listed in the Schedule are considered extraditable offenses. As amended by Article I of the Protocol, Article 2 of the 1971 Treaty, as amended, adopts a dual criminality approach, which emphasizes extradition based on underlying criminal conduct rather than for a particular offense. A dual criminality clause permits extradition for any crime that is punishable in both countries by imprisonment or other detention for at least one year. Inclusion of a dual criminality clause, therefore, obviates the need to renegotiate or supplement the Treaty as offenses, such as computer-related crimes or money laundering, become punishable under the laws of both states.

Article I of the Protocol replaces Article 2 of the 1971 Treaty and provides that an offense is extraditable notwithstanding that conduct such as interstate transportation or use of the mails or of other facilities affecting interstate or foreign commerce, required for the purpose of establishing jurisdiction, forms part of the offense in the United States. This provision will allow the United States to request extradition for offenses including interstate and foreign travel or transportation in aid of racketeering enterprises

2

even though the Canadian laws do not include analogous jurisdictional elements for similar underlying criminal behavior. The new provision also stipulates that offenses that relate to taxation or revenue or that are of a "purely fiscal character" will be extraditable offenses.

Article II of the Protocol is a technical amendment, deleting the Schedule of extraditable offenses annexed to the 1971 Treaty, as amended, and incorporated by reference in Article 2.

Article III of the Protocol deletes Article 3 of the 1971 Treaty, in which a particularized definition of "territory," which was necessary at that time to cover certain types of hijacking offenses, is no longer necessary, as both the United States and Canada are parties to the Hague Convention for the Suppression of Unlawful Seizure of Aircraft, done at The Hague December 16, 1970, and entered into force October 14, 1971, (Hijacking Convention) (22 U.S.T. 1641; TIAS 7192) and the Montreal Convention for the Suppression of Unlawful Acts Against the Safety of Civil Aviation, done at Montreal September 23, 1971, and entered into force January 26, 1973, (Sabotage Convention) (24 U.S.T. 564; TIAS 7570).

Article 3(3) of the 1971 Treaty is amended to give the Executive or other appropriate Authority the discretion to extradite fugitives when the requesting state has jurisdiction over an offense in a situation where the laws of the requested state would not provide for jurisdiction in similar circumstances.

Article IV of the Protocol replaces Article 4 of the 1971 Treaty, and effectively limits the scope of the political offense exception. It specifies certain crimes which shall not be regarded as political offenses, including murder, manslaughter, malicious assault, kidnapping, specified explosives offenses, and conspiracy or attempt to commit any of the foregoing offenses.

In addition, Article IV of the Protocol includes a provision that excludes from the reach of the political offense exception any offense for which both the United States and Canada have an international treaty obligation to extradite the person or submit his case for prosecution; e.g., aircraft hijacking pursuant to the Hijacking Convention; aircraft sabotage pursuant to the Sabotage Convention; crimes against internationally protected persons, including diplomats, under the Convention on the Prevention and Punishment of Crimes against Internationally Protected Persons, including Diplomatic Agents, done at New York December 14, 1973 (28 U.S.T. 1975; TIAS 8532); and hostage taking pursuant to the International Convention against the Taking of Hostages, done at New York on December 17, 1979. This exception will also extend to crimes similarly defined in future multilateral treaties.

Article V of the Protocol replaces Article 7 of the 1971 Extradition Treaty, which allows the Requested State to defer surrender of a fugitive being proceeded against or serving a sentence in its territory until the conclusion of the proceedings and the full execution of any punishment. Under the Protocol, the Requested State has the discretion to choose to extradite to the Requesting State a fugitive who is serving a prison sentence in the Requested State before the expiration of his sentence. This alternative of temporary surrender is routinely included in our modern extradition treaties.

3

Article VI of the Protocol replaces Article 11(3) of the current Treaty to extend the period of provisional arrest in the Requested State from forty-five days to sixty days, which is the time period most commonly provided under U.S. extradition treaties. The extension will allow prosecutors greater latitude in assembling extradition packages and in making necessary adjustments or additions to the documents.

Article VII of the Protocol amends the 1971 Treaty by adding a provision that establishes that, in cases where both states have jurisdiction to prosecute for an offense, the Executive Authority of the Requested State will consult with the Executive Authority of the Requesting State and make a decision whether to extradite the fugitive, or whether to submit the case to its competent authorities for the purpose of prosecution, after considering all relevant factors.

Article VIII of the Protocol provides that its provisions shall apply to any offense committed, any request made or any person found extraditable before or after the entry into force of the Protocol, but shall not apply to an offense committed before the Protocol enters into force if the offense in question was not an offense under the laws of both Contracting Parties at the time of its commission.

Article IX of the Protocol sets forth the procedures for ratification and entry into force.

I enclose, for the information of the Senate, an exchange of letters, dated January 11, 1988, which restates that the transborder abduction of persons found in Canada to the United States of America by civilian agents of bail bonding companies, so-called "bounty hunters," is an extraditable offense under the 1971 Extradition Treaty.

The Department of Justice joins the Department of State in favoring transmission of this Protocol to the Senate at the earliest possible date.

Respectfully submitted,

JAMES W. BAKER III.

Enclosure: As stated.

THE SECRETARY OF STATE,
*Washington, January 11, 1988.*

Hon. JOE CLARK, P.C., M.P.,
*Secretary of State for External Affairs of Canada, Ottawa.*

DEAR MR. MINISTER: I refer to the Protocol Amending the Treaty on Extradition between the United States and Canada we signed today and have the honor to address to you the following.

The United States and Canada recognize that the transborder abduction of persons found in Canada to the United States of America by civilian agents of bail bonding companies, so-called "bounty hunters", is an extraditable offense under the United States-Canada Extradition Treaty.

Where a person has been charged with or convicted of such an offense in Canada and is found within the jurisdiction of the United States, the United States agrees, upon request, to commence extradition proceedings against such a person pursuant to the Treaty in order that the person may be returned to Canada.

4

The United States will use its best efforts to honor Canadian requests for testimony, information, or other assistance pertaining to such abductions.

Canada and the United States agree to cooperate to deter such transborder abductions. To assist in achieving that purpose, the United States will continue to exert its best efforts to inform those engaged in business as bail bondsmen or bounty hunters and other interested parties of the positions set forth in this exchange of letters.

Canada and the United States agree to consult promptly concerning any case of transborder abduction involving bounty hunters which might arise in the future. The purpose of such consultations shall be to address matters relating to any such case, including any request by the Government of Canada for the return of the person so abducted. In the event of return, the Governments agree to cooperate to have the abducted person escorted to Canada and taken into custody at the border, pursuant to a request for provisional arrest, pending the outcome of extradition proceedings. For the purpose of these consultations, the principal law enforcement contact for the United States will be the Director of the Office of International Affairs of the Criminal Division of the Department of Justice.

I have the honor to propose that this letter and your reply constitute an understanding between our two Governments which is not intended to create or otherwise alter legal obligations for either Government nor to create or otherwise alter any rights or privileges for private parties.

Sincerely yours,

GEORGE P. SHULTZ.

———

OTTAWA, *January 11, 1988.*

JLA–0026.
Hon. GEORGE P. SHULTZ,
*Secretary of State of the United States of America.*

DEAR MR. SECRETARY: I have the honour to acknowledge receipt of your letter of today's date concerning transborder abduction of persons found in Canada to the United States of America by civilian agents of bail bonding companies, so-called "bounty hunters". I accept your proposal that your letter and this reply constitute an Understanding between our two Governments which is not intended to create or otherwise alter legal obligations for either Government nor to create or otherwise alter any rights or privileges for private parties.

Yours sincerely,

JOE CLARK.

PROTOCOL AMENDING THE TREATY ON EXTRADITION BETWEEN THE UNITED STATES OF AMERICA AND CANADA SIGNED AT WASHINGTON ON DECEMBER 3, 1971, AS AMENDED BY AN EXCHANGE OF NOTES ON JUNE 28 AND JULY 9, 1974

The Government of the United States of America and the Government of Canada;

Desiring to make more effective the Extradition Treaty between the Contracting Parties, signed at Washington on December 3, 1971, as amended by the agreement effected by an Exchange of Notes on June 28 and July 9, 1974 (hereinafter referred to as "the Extradition Treaty");

Have agreed as follows:

ARTICLE I

Article 2 of the Extradition Treaty is deleted and replaced by the following:

"ARTICLE 2

"(1) Extradition shall be granted for conduct which constitutes an offense punishable by the laws of both Contracting Parties by imprisonment or other form of detention for a term exceeding one year or any greater punishment.

"(2) An offense is extraditable notwithstanding

"(i) that conduct such as interstate transportation or use of the mails or of other facilities affecting interstate or foreign commerce, required for the purpose of establishing jurisdiction, forms part of the offense in the United States, or

"(ii) that it relates to taxation or revenue or is one of a purely fiscal character."

ARTICLE II

The SCHEDULE to the Extradition Treaty, as amended, is deleted.

ARTICLE III

Paragraph (2) of Article 3 of the Extradition Treaty is deleted. Paragraph (3) of Article 3 of the Extradition Treaty is amended to read as follows:

"(2) When the offense for which extradition is requested was committed outside the territory of the requesting State, the executive or other appropriate authority of the requested State shall grant extradition if the laws of the requested State provide for jurisdiction over such an offense committed in similar circumstances. If the laws in the requested State do not so provide, the executive

6

authority in the requested State may, in its discretion, grant extra-
dition."

### ARTICLE IV

Paragraph (2) of Article 4 of the Extradition Treaty, as amended,
is deleted and replaced by the following:

"(2) For the purpose of this Treaty, the following offenses shall
be deemed not to be offenses within subparagraph (iii) of paragraph
1 of this Article:

"(i) An offense for which each Contracting Party has the ob-
ligation pursuant to a multilateral international agreement to
extradite the person sought or to submit the case to its compe-
tent authorities for the purpose of prosecution;

"(ii) Murder, manslaughter or other culpable homicide, mali-
cious wounding or inflicting grievous bodily harm;

"(iii) An offense involving kidnapping, abduction, or any
form of unlawful detention, including taking a hostage;

"(iv) An offense involving the placing or use of explosives, in-
cendiaries or destructive devices or substances capable of en-
dangering life or of causing grievous bodily harm or substan-
tial property damage; and

"(v) An attempt or conspiracy to commit, or counselling the
commission of, any of the foregoing offenses, or aiding or abet-
ting a person who commits or attempts to commit such of-
fenses."

### ARTICLE V

Article 7 of the Extradition Treaty is deleted and replaced by the
following:

### "ARTICLE 7

"When the person sought is being proceeded against or is serving
a sentence in the requested State for an offense other than that for
which extradition is requested, the requested State may surrender
the person sought or postpone surrender until the conclusion of the
proceedings or the service of the whole or any part of the sentence
imposed."

### ARTICLE VI

Paragraph (3) of Article 11 of the Extradition Treaty is deleted
and replaced by the following:

"(3) A person arrested shall be set at liberty upon the expiration
of sixty days from the date of arrest pursuant to such application if
a request for extradition and the documents specified in Article 9
have not been received. This stipulation shall not prevent the insti-
tution of proceedings with a view to extraditing the person sought
if the request and documents are subsequently received."

### ARTICLE VII

The Extradition Treaty is amended by adding the following after
Article 17:

7

"ARTICLE 17 BIS

"If both contracting Parties have jurisdiction to prosecute the person for the offense for which extradition is sought, the executive authority of the requested State, after consulting with the executive authority of the requesting State, shall decide whether to extradite the person or to submit the case to its competent authorities for the purpose of prosecution. In making its decision, the requested State shall consider all relevant factors, including but not limited to:

"(i) the place where the act was committed or intended to be committed or the injury occurred or was intended to occur;

"(ii) the respective interests of the Contracting Parties;

"(iii) the nationality of the victim or the intended victim; and

"(iv) the availability and location of the evidence."

ARTICLE VIII

Notwithstanding paragraph (2) of Article 18 of the Extradition Treaty, this Protocol shall apply in all cases where the request for extradition is made after its entry into force regardless of whether the offense was committed before or after that date.

ARTICLE IX

(1) This Protocol shall be subject to ratification in accordance with the applicable procedures of the Government of the United States and the Government of Canada and instruments of ratification shall be exchanged as soon as possible.

(2) The Protocol shall enter into force upon the exchange of instruments of ratification.

IN WITNESS WHEREOF, the undersigned, being duly authorized thereto by their respective Governments, have signed this Protocol.

DONE in duplicate at Ottawa, this 11th day of January 1988, in the English and French languages, the two texts being equally authentic.

For the Government of the United States of America.

GEORGE P. SHULTZ.

For the Government of Canada.

JOE CLARK.

O

**FORM:**      **Certificate of Official Records**

<u>CERTIFICATE OF AUTHENTICITY OF OFFICIAL RECORDS</u>

I, the undersigned, _____, attest that my position with the

Government of Canada is _____ and that in that position I am authorized by

the laws of Canada to attest that the documents attached hereto and described below:

(1)    are true copies of official records that are authorized by the laws of Canada to be

recorded or filed in _____, which is a government

office or agency.

(2)    set forth matters that are authorized by the laws of Canada to be reported and

recorded or filed.

Description of Documents:

(SEAL)

_____
(Signature)

_____
(Title)

_____
(Place)

_____
(Date)

| 107TH CONGRESS<br>*2d Session* | SENATE | TREATY DOC.<br>107–11 |
| --- | --- | --- |

# SECOND PROTOCOL AMENDING EXTRADITION TREATY WITH CANADA

---

## MESSAGE

FROM

# THE PRESIDENT OF THE UNITED STATES

TRANSMITTING

SECOND PROTOCOL AMENDING THE TREATY ON EXTRADITION BETWEEN THE GOVERNMENT OF THE UNITED STATES OF AMERICA AND THE GOVERNMENT OF CANADA, SIGNED AT OTTAWA ON JANUARY 12, 2001



JULY 11, 2002.—The Protocol was read the first time, and together with the accompanying papers, referred to the Committee on Foreign Relations and ordered to be printed for the use of the Senate

---

U.S. GOVERNMENT PRINTING OFFICE

WASHINGTON : 2002

99–118

## LETTER OF TRANSMITTAL

THE WHITE HOUSE, *July 11, 2002.*

*To the Senate of the United States:*

With a view to receiving the advice and consent of the Senate to ratification, I transmit herewith the Second Protocol Amending the Treaty on Extradition Between the Government of the United States of America and the Government of Canada, as amended, signed at Ottawa on January 12, 2001. In addition, I transmit, for the information of the Senate, the report of the Department of State with respect to the Second Protocol. As the report explains, the Second Protocol will not require implementing legislation.

The Second Protocol amends the Extradition Treaty Between the United States of America and Canada, signed at Washington on December 3, 1971, as amended by an Exchange of Notes of June 28 and July 9, 1974, and by a Protocol signed at Ottawa on January 11, 1988.

The Second Protocol, upon entry into force, will enhance cooperation between the law enforcement communities of both nations. The Second Protocol incorporates into the U.S.-Canada Extradition Treaty a provision on temporary surrender of persons that is a standard provision in more recent U.S. bilateral extradition treaties. It also provides for new authentication requirements of documentary evidence, which should streamline the processing of extradition requests.

I recommend that the Senate give early and favorable consideration to the Second Protocol and give its advice and consent to ratification.

GEORGE W. BUSH.

(III)

## LETTER OF SUBMITTAL

DEPARTMENT OF STATE,
*Washington, May 31, 2002.*

The PRESIDENT,
*The White House.*

THE PRESIDENT: I have the honor to submit to you the Second Protocol Amending the Treaty on Extradition Between the Government of the United states of America and the Government of Canada, signed at Ottawa on January 12, 2001 ("Second Protocol"). I recommend that the Second Protocol be transmitted to the Senate for its advice and consent to ratification.

The Second Protocol will strengthen the U.S.-Canada extradition relationship by incorporating a temporary surrender mechanism into the Extradition Treaty Between the United States of America and Canada, signed at Washington on December 3, 1971, as amended by an Exchange of Notes of June 28 and July 9, 1974, and by a Protocol signed at Ottawa on January 11, 1988 ("Extradition Treaty"). The Second Protocol will also streamline the extradition process by modifying the Extradition Treaty's authentication requirements relating to the admissibility of documentary evidence.

A temporary surrender mechanism has become a standard provision in more recent U.S. bilateral extradition treaties. It allows person who have been found extraditable to be temporarily surrendered to one State to stand trial while they are still serving sentences in the other State. Temporary surrender can be an important tool for use in cases where serious crimes have been committed in one country which might go unpunished if trial in that country were to be delayed for a long period while a sentence was being served for crimes committed in the other country. It enables sequential trials of individuals who have committed extraditable offenses in both countries at a time when witnesses and evidence to both crimes are more readily available.

Article 1 of the Second Protocol amends the Extradition Treaty to provide for a new Article 7bis, which will follow Article 7's existing provisions authorizing the State in receipt of an extradition request ("requested State") to delay surrender until after proceedings against a person in that State have been completed or the person's sentence in that State has been served.

New article 7bis(1) provides that if the requested State has granted an extradition request in accordance with the Treaty with respect to a person who already has been convicted and sentenced in the requested State, it may temporarily surrender the person to the requesting State for prosecution. It further provides that the courts of the requested State must not be divested by virtue of the temporary surrender of jurisdiction over any appeal or habeas cor-

pus application relating to the conviction or sentence in the requested State.

Article 7bis(2) provides that the person surrendered pursuant to paragraph (1) must be kept in custody in the requesting State. It also provides that the person must be returned to the requested State within forty-five days after the conclusion of the proceedings for which the person's presence was required or at another time as specified by the requested State, in accordance with conditions determined by the Parties. This provision anticipates that authorities in the United States and Canada, which in some cases will include state-level authorities, will consult to determine appropriate conditions for the temporary surrender of an individual, including arrangements for the transfer and return of the prisoner, as well as any extraordinary matters that may be relevant, such as medical care requirements. Consistent with our normal extradition practice, any case-specific agreements or assurances relating to the temporary surrender would be concluded by the federal authorities on behalf of state authorities. Similar to the language in paragraph (1), Article 7bis(2) also provides that the transfer of the person back to the requested State will not divest the courts of the requesting State of jurisdiction over any appeal or habeas corpus application relating to the matter for which the prisoner was temporarily surrendered.

Article 7bis(3) provides that the time spent in custody in the requesting State may be credited to the sentence in the requested State. In the case of the United States, credit for time served by a person surrendered to Canadian authorities may differ among U.S. state and federal authorities.

Article 7bis(4) provides that the requested State can waive the return of the surrendered person in the event the person's sentence in the requested State expires during the temporary surrender period. Article 7bis(4) provides that in such cases the person's surrender shall be considered a "final surrender" under the Extradition Treaty.

Because temporary surrender is contingent on a grant of extradition, Article 7bis(5) provides that the requesting State does not have to make a further request for the extradition of a person who has been returned to the requested State after having been convicted and sentenced in the requesting State for the offense for which temporary surrender was granted.

Article 7bis(6) provides that a person who has been returned to the requested State, after having been convicted and sentenced during a temporary surrender, must be finally surrendered once the custodial portion of the person's sentence in the requested State has been completed or, if the requested State so specifies, at an earlier time. This provision contemplates that the requested State will finally surrender a person who has been released on parole or under other conditions. It also envisions that the requested State may choose to surrender the person at an earlier time.

Article 7bis(7) recognizes that there may be reasons not to proceed with final surrender even though the person was convicted and sentenced during a temporary surrender. Article 7bis(7) (a) provides that final surrender will not take place when the requesting State advises that it is no longer required because the sentence

VII

imposed in the requesting State has expired or for other reasons. Similarly, Article 7bis(7) (b) provides that the person will not be surrendered to the requesting State in the event the competent authority of the requested State revokes its original grant of extradition.

Article 2 of the Second Protocol will establish a new framework for the admissibility of documentary evidence in support of a request for extradition by replacing existing Article 10(2) of the Extradition Treaty.

Consistent with U.S. extradition law on the admissibility of documentation, new Article 10(2)(a) reiterates the existing requirement that, in the case of a request from Canada, documents be authenticated by an officer of the Department of Justice of Canada and certified by the principal diplomatic or consular office of the United States in Canada. Article 10(2)(b), however, changes existing requirements with respect to requests emanating from the United States, so as to take advantage of changes in Canadian law regarding the admissibility of extradition documents in Canadian courts. Specifically, Article 10(2)(b) eliminates the requirement that the United States have its documentary evidence in support of extradition requests to Canada authenticated by an officer of the U.S. Department of State and certified by the principal diplomatic or consular officer of Canada in the United States. Instead, Article 10(2) (b) streamlines the authentication process by allowing documents to be certified by a judicial authority or prosecutor who attests that the evidence is available for trial and is sufficient to justify prosecution under the law of the prosecuting jurisdiction. When the person whose extradition is sought has already been convicted, documents supporting the U.S. request are to be certified by a judicial, prosecuting or correctional authority who can attest to the fact that the documents are accurate. These changes should simplify and thereby reduce the administrative burden of processing extradition requests by the United States.

New Article 10(2) (c) provides an alternative to subparagraphs (a) and (b), by providing that documents may also be certified or authenticated in any other manner accepted by the law of the requested State. This addition will enable both countries to take advantage of any changes to their applicable laws.

Article 3 of the Second Protocol addresses the relationship between the Second Protocol and the Extradition Treaty. Paragraph (1) provides that the Second Protocol will form an integral part of the Extradition Treaty. Paragraph (2) provides for retroactivity, noting that, notwithstanding paragraph (2) of Article 18 of the Extradition Treaty, the Second Protocol will apply in all cases where the request for extradition is made after its entry into force regardless of whether the offense was committed before or after that date. Finally, paragraph (3) provides that the Second Protocol is subject to ratification, and enters into force upon the exchange of instruments of ratification. The Second Protocol would terminate upon termination of the Extradition Treaty.

The Second Protocol does not require implementing legislation. A Technical Analysis explaining in detail the provisions of the Second Protocol is being prepared by the United States negotiating delegation, consisting of the Departments of State and Justice, and will

VIII

be submitted separately to the Senate Committee on Foreign Relations.

The Department of Justice joins the Department of State in favoring approval of this Second Protocol by the Senate at an early date.

Respectfully submitted,

COLIN L. POWELL.

SECOND PROTOCOL AMENDING THE TREATY ON EXTRADITION

BETWEEN

THE GOVERNMENT OF THE UNITED STATES OF AMERICA

AND

THE GOVERNEMENT OF CANADA

Signed at Washington on December 3, 1971,
as amended by an Exchange of Notes at Washington on June 28 and July 9, 1974,
and by a Protocol signed at Ottawa on January 11, 1988

THE GOVERNMENT OF THE UNITED STATES OF AMERICA AND
THE GOVERNMENT OF CANADA (hereinafter "the Parties");

RECOGNIZING the close bilateral relationship which exists between them,
reflected in numerous instruments and mechanisms of legal cooperation;

COMMITTED to strengthening legal cooperation in the fight against crime;
and

DESIRING to make more effective the Extradition Treaty between the Parties,
signed at Washington on December 3, 1971 (hereinafter "the Extradition Treaty"), as
amended by an exchange of notes of June 28 and July 9, 1974, and the Protocol to the
Extradition Treaty between the Parties, signed at Ottawa on January 11, 1988
(hereinafter "the Protocol");

HAVE AGREED as follows:

## ARTICLE 1

The Extradition Treaty is amended by adding the following after Article 7:

"Article 7 bis

1.      The requested State, after granting an extradition request made in accordance
with the Extradition Treaty, may temporarily surrender a person who has been
convicted and sentenced in the requested State, in order that the person sought may be
prosecuted in the requesting State. The temporary surrender of the person shall not
divest the Courts in the requested State of jurisdiction over any appeal or habeas corpus
application relating to the conviction or sentence that otherwise may be available under
the laws of the requested State.

(1)

2

2.      A person temporarily surrendered pursuant to paragraph 1 shall be kept in custody in the requesting State. The person shall be returned to the requested State within forty-five (45) days after the conclusion of the proceedings for which the person's presence was required in the requesting State or at another time as specified by the requested State, in accordance with conditions to be determined by the Parties for that purpose.   The return of the person to the requested State shall not divest the Courts in the requesting State of jurisdiction over any appeal or habeas corpus application that otherwise may be available under the laws of that State, in relation to the matter for which the person was temporarily surrendered.

3.      The period of time spent in custody in the requesting State may be credited to the sentence in the requested State.

4.      When the sentence that the person was serving in the requested State expires during the temporary surrender, the requested State may waive the return of the person and the surrender will be considered to be a final surrender.  A "final surrender" is a surrender of a person pursuant to this Treaty other than as provided for by this Article.

5.      Subject to paragraph 7, if a person temporarily surrendered and returned to the requested State has been sentenced to imprisonment in the requesting State for the offence for which the person was temporarily surrendered, the person shall be finally surrendered to the requesting State, in accordance with paragraph 6, without a further request for extradition.

6.      Final surrender shall take place when the person has finished serving the custodial portion of the sentence in the requested State, or at an earlier time specified by the requested State.

7.      Final surrender shall not take place when:

    (a)     the requesting State advises that final surrender is no longer required due to the expiration of the sentence imposed or for other reasons; or

    (b)     after the temporary surrender, the warrant or order for the final surrender of a person sought is revoked by the competent authority of the requested State."

### ARTICLE 2

Article 10(2) of the Extradition Treaty is deleted and replaced by the following text:

"(2)   The documentary evidence in support of a request for extradition or copies of these documents shall be admitted in evidence in the examination of the request for extradition when:

    (a)     in the case of a request emanating from Canada, they are authenticated by an officer of the Department of Justice of Canada and are certified by the principal diplomatic or consular officer of the United States in Canada;

3

(b)  in the case of a request emanating from the United States for a person who is sought for prosecution, they are certified by a judicial authority or prosecutor who attests that the evidence is available for trial and is sufficient to justify prosecution under the law of the prosecuting jurisdiction. In the case of a request emanating from the United States for a person who is sought in connection with a conviction, the documents must be certified by a judicial, prosecuting or correctional authority who attests to the fact that the documents are accurate; or

(c)  they are certified or authenticated in any other manner accepted by the law of the requested State."

## ARTICLE 3

1.  This Second Protocol shall form an integral part of the Extradition Treaty.

2.  Notwithstanding paragraph (2) of Article 18 of the Extradition Treaty, this Second Protocol shall apply in all cases where the request for extradition is made after its entry into force regardless of whether the offence was committed before or after that date.

3.  This Second Protocol shall be subject to ratification, and shall enter into force upon the exchange of instruments of ratification. It shall terminate upon termination of the Extradition Treaty.

IN WITNESS WHEREOF, the undersigned, being duly authorized by their respective Governments, have signed this Second Protocol.

DONE in duplicate at Ottawa this Twelfth day of January 2001 in the English and French languages, the two texts being equally authentic.

FOR THE GOVERNMENT OF
THE UNITED STATES OF
AMERICA

FOR THE GOVERNMENT
OF CANADA

CANADA                           )         **HER MAJESTY THE QUEEN**

                                     )

PROVINCE OF ONTARIO         )                  **v.**

                                     )

TORONTO REGION             )         **ANTHONY REYNOLDS**

---

### IN THE MATTER of a request by Canada
### for the Extradition of Anthony REYNOLDS from the United States of America
### with respect to offences under the Criminal Code of Canada

---

### AFFIDAVIT OF JANET GALLIN

---

      I, Janet Gallin, of the Township of Tiny, in the County of Simcoe, in the Province of

Ontario, Canada, a lawyer for the Ministry of the Attorney General for the Province of Ontario,

Canada, MAKE OATH AND SAY AS FOLLOWS:

## A.    QUALIFICATIONS

1.    I am a Barrister and Solicitor qualified to practice law in the Province of Ontario, Canada,

since March 1991.  Since March 1991, I have practiced law in the employment of the Crown Law

Office – Criminal of the Ministry of the Attorney General for the Province of Ontario, with the

exception of an approximate one year period from October 1993 to October 1994 when I was in

private practice and the year 2006 when I was on a self-funded leave of absence.  I presently

hold the position of Counsel in the Crown Law Office – Criminal.

2

2.      As a result of my training, my employment, and my experience, I am very knowledgeable about Canadian criminal law.

3.      The Crown Law Office - Criminal, is a branch of the Criminal Law Division of the Ministry of the Attorney General.  At present it is staffed by over 70 lawyers, each of whom specialize in criminal law.  The responsibilities of counsel with the Crown Law Office - Criminal include representing the Crown in all criminal appeals for the Province of Ontario before the Ontario Court of Appeal and the Supreme Court of Canada.  In addition, counsel with the Crown Law Office - Criminal conduct special prosecutions, typically involving offences against the administration of justice.

4.      The Crown Law Office - Criminal also has been directed to exercise responsibility on behalf of the Attorney General of Ontario with respect to applications by the Attorney General of Ontario for the extradition to Canada from foreign jurisdictions of persons charged in Ontario with offences contrary to the Criminal Code of Canada.  In addition, the Crown Law Office - Criminal is responsible for carriage of applications for assistance by Canada (on behalf of Ontario) and made to Canada under the Mutual Legal Assistance Treaty (MLAT).

5.      From 1991 to the present time, I have represented the Crown on appeals at the Ontario Court of Appeal and the Supreme Court of Canada.  My title within the Crown Law Office - Criminal is "Research Counsel."  I do less litigation than my colleagues but provide research assistance to Crown Counsel throughout Ontario on criminal law matters.  I have also had

3

carriage of requests for extradition involving the United States, which required the preparation of an affidavit of law. Based upon my training and experience, I am an expert in the criminal laws and procedure of Canada.

**B.      THE EXTRADITION REQUEST**

6.      Canada is seeking the extradition of Anthony REYNOLDS on the following charges, all of which are alleged to have been committed on or about December 22, 2005 at Weston Road and Church Street, in the City of Toronto, Toronto Region, Ontario, Canada:

a.      Attempted Murder *Criminal Code* s. 239 (count 1):

Anthony REYNOLDS on or about the 22nd day of December in the year 2005 in the City of Toronto, in the Toronto Region did attempt to murder Felix TWUM by shooting him contrary to the *Criminal Code.*

b.      Attempted Murder While Using a Firearm *Criminal Code* s. 239(a) (count 2)

Anthony REYNOLDS on or about the 22nd day of December in the year 2005 in the City of Toronto, in the Toronto Region did attempt to murder Felix TWUM while using a firearm by shooting him contrary to the *Criminal Code.*

c.      Aggravated Assault *Criminal Code* s. 268 (count 3)

Anthony REYNOLDS on or about the 22nd day of December in the year 2005 in the City of Toronto, in the Toronto Region did maim Felix TWUM thereby committing an aggravated assault contrary to the *Criminal Code.*

d.      Discharge Firearm Endanger Life *Criminal Code* s. 244(b) (count 4)

4

Anthony REYNOLDS on or about the 22nd day of December in the year 2005 in the City of Toronto, in the Toronto Region with intent to endanger the life of Felix TWUM discharge a firearm at Felix TWUM contrary to the *Criminal Code*.

e.   Assault With a Weapon *Criminal Code* s. 267(a) (count 5)

Anthony REYNOLDS on or about the 22nd day of December in the year 2005 in the City of Toronto, in the Toronto Region did in committing an assault on Felix TWUM carry a weapon to wit a firearm contrary to the *Criminal Code*.

f.   Pointing a Firearm *Criminal Code* s. 87 (count 6)

Anthony REYNOLDS on or about the 22nd day of December in the year 2005 in the City of Toronto, in the Toronto Region did without lawful excuse point a firearm to wit a handgun at Felix TWUM contrary to the *Criminal Code*.

g.   Use of Firearm while committing indictable offence of Aggravated Assault *Criminal Code* s. 85 (count 7)

Anthony REYNOLDS on or about the 22nd day of December in the year 2005 in the City of Toronto, in the Toronto Region did use a firearm to wit a handgun while committing the indictable offence of Aggravated Assault contrary to the *Criminal Code*.

h.   Use of Firearm while committing indictable offence of Assault with a weapon *Criminal Code* s. 85 (count 8)

Anthony REYNOLDS on or about the 22nd day of December in the year 2005 in the City of Toronto, in the Toronto Region did use a firearm to wit a handgun while committing the indictable offence of Assault with a weapon contrary to the

5

*Criminal Code.*

7.    These offences are set out as counts 1 to 8 in the Information sworn on May 2, 2008 by

Gary Sangha of the Toronto Police Service (Exhibit "C" to the affidavit of Darren Townley).  A

previous Information (Exhibit "A" to the affidavit of Darren Townley) was sworn on May 4,

2006.  Also on May 4, 2006 a warrant of arrest was issued by His Worship Justice of the Peace

Stephen Waisberg of the Ontario Court, Provincial Division (Exhibit "B" to the affidavit of

Darren Townley).  On the advice of Crown Counsel the May 2, 2008 Information was sworn to

replace the May 4, 2006 Information, but the May 4, 2006 warrant of arrest is still in full force

and effect throughout Canada.   When this matter comes before a Canadian Court, the

Informations sworn prior to May 2, 2008 will be withdrawn and the Crown will ultimately be

proceeding on the Information which is Exhibit "C" to the affidavit of Darren Townley.  The

Informations and Warrant that are exhibits to Darren Townley's affidavit are certified true copies.


8.    Canada is **not** seeking extradition on the following counts which were set out in the first

Information which was sworn May 4, 2006:

      a.    Possession of an Unregistered Restricted Weapon *Criminal Code* s. 91(1) (count

          6)

      b.    Unauthorized Presence of a Firearm in a Motor Vehicle *Criminal Code* s. 94(1)

          (count 8)

      c.    Attempt Fraud Over *Criminal Code* s. 380 (count 9)

6

9.    I have carefully reviewed the affidavit of Darren Townley, and the Exhibits attached to it, which accompany this extradition application.  Included in those Exhibits are certified copies of the Information and Warrant for Arrest, which I have carefully reviewed. Based on the affidavit and the Exhibits I believe that Anthony REYNOLDS is charged with the counts outlined in paragraph 6 of my affidavit with respect to incidents which allegedly occurred in the City of Toronto, Ontario on or about December 22, 2005.

## C.    *Criminal Code* PROVISIONS

10.    The *Criminal Code of Canada*, Revised Statutes of Canada, 1985, Chapter C-46, as amended, is a statute enacted by the Parliament of Canada.  It contains the law relating to criminal offences for the whole of Canada.  It therefore applies to Ontario.  The particular sections of the *Criminal Code* relevant to the instant extradition request were in force on the day of the alleged offence.  As noted below, some of the offence provisions have since been amended, but those amendments do not affect the charges against REYNOLDS.

11.    Under Canadian law, criminal offences are divided into three categories:

    a.    indictable offences;

    b.    summary conviction offences;

    c.    offences that are, at the election of the prosecution, either indictable or summary conviction (referred to also as "hybrid" offences).

7

12.    Canadian law has abolished the common law division of offences into felonies and misdemeanours.  However, indictable offences are roughly equivalent to felonies and summary conviction offences are roughly equivalent to misdemeanours.  Generally speaking, indictable offences are the most serious offences carrying the most serious penalties; summary conviction offences are generally less serious offences and carry less severe penalties.  Unless otherwise provided by law, a summary conviction offence is punishable by a maximum sentence of 6 months jail or a $2000 fine or both (s. 787(1) of the *Criminal Code*) and is subject to a 6 month limitation period.  Some of the offences with which REYNOLDS is charged are indictable; others are at the election of the prosecution (hybrid offences) but since the Crown has not yet made a formal  election on these charges, they are deemed to be indictable until the prosecution makes an election.  In any event, in this case, the Crown will be electing to proceed by indictment in all hybrid offences, meaning that there are no limitation periods with respect to the charged offences.


**Definitions**


13.    Before turning to a description of the offences themselves, here are certain definitions which are applicable to some of the offences.  The *Criminal Code* contains a definition section (section 2) which applies to all of the *Criminal Code.*

*Definitions applying to Criminal Code*

       **"Bodily Harm"** means any hurt or injury to a person that interferes with the health or

8

comfort of the person and that is more than merely transient or trifling in nature

**"Firearm"** means a barrelled weapon from which any shot, bullet or other projectile can be discharged and that is capable of causing serious bodily injury or death to a person, and includes any frame or receiver of such a barrelled weapon and anything that can be adapted for use as a firearm (Section 2, *Criminal Code*)

**"Weapon"** means any thing used, designed to be used or intended for use
     (a)    in causing death or injury to any person, or
     (b)    for the purpose of threatening or intimidating any person
and, without restricting the generality of the foregoing, includes a firearm  (Section 2, *Criminal Code*)

14.    I now turn to the offences with which REYNOLDS is charged.  These provisions are as they existed during the time-frame of the alleged offences.  They were duly enacted and proclaimed into force at the time of the alleged offences and would be applicable in the event of a trial in this case.

**ATTEMPTED MURDER *CRIMINAL CODE* s. 239(b) & ATTEMPTED MURDER WHILE USING A FIREARM *Criminal Code* 239(a) (Counts 1 and 2)**

15.    The offences of "attempted murder" and the offence of "attempted murder while using a firearm" are set out in ss. 239(b) and 239(a) of the *Criminal Code* respectively, and read as follows at the time REYNOLDS is alleged to have committed the offence[1]:

**SECTION 239.**
*Attempt to commit murder*

---

[1] Section 239 of the *Criminal Code* was amended and these amendments came into force May 1, 2008, but these amendments will not apply to the prosecution of REYNOLDS because he will be tried under the section which was in effect at the time he committed the offence.  If the new provision contained a lesser punishment, he would have been entitled to the benefit of that lesser punishment, but in fact the new legislation increases the penalties thus REYNOLDS is entitled to the benefit of the lesser punishment which was in effect at the time he allegedly committed this offence.

9

239. Every person who attempts by any means to commit murder is guilty of an indictable offence and liable

    (a) where a firearm is used in the commission of the offence, to imprisonment for life and to a minimum punishment of imprisonment for a term of four years; and

    (b) in any other case, to imprisonment for life.


16.    "Attempt" is set out in the *Criminal Code* as follows:

**SECTION 24.**
*Attempts*
24. (1) Every one who, having an intent to commit an offence, does or omits to do anything for the purpose of carrying out the intention is guilty of an attempt to commit the offence whether or not it was possible under the circumstances to commit the offence.
*Question of law*
(2) The question whether an act or omission by a person who has an intent to commit an offence is or is not mere preparation to commit the offence, and too remote to constitute an attempt to commit the offence, is a question of law.


17.    "Murder" is set out in the *Criminal Code* as follows:

**SECTION 229.**
*Murder*
229. Culpable homicide is murder
(a) where the person who causes the death of a human being
    (i) means to cause his death, or
    (ii) means to cause him bodily harm that he knows is likely to cause his death, and is reckless whether death ensues or not;
(b) where a person, meaning to cause death to a human being or meaning to cause him bodily harm that he knows is likely to cause his death, and being reckless whether death ensues or not, by accident or mistake causes death to another human being, notwithstanding that he does not mean to cause death or bodily harm to that human being; or
(c) where a person, for an unlawful object, does anything that he knows or ought to know is likely to cause death, and thereby causes death to a human being, notwithstanding that he desires to effect his object without causing death or bodily harm to any human being.


18.    In order to prove the offence of attempted murder, the Crown must prove beyond a

reasonable doubt that the accused had a specific intent to kill.  Intention may be inferred from the

10

facts surrounding the offence.

19.    If found guilty of committing attempted murder while using a firearm, REYNOLDS would face a minimum sentence of four years and a maximum sentence of life in prison.

## AGGRAVATED ASSAULT *CRIMINAL CODE* s. 268

20.    The offence of "aggravated assault" is set out in s. 268 of the *Criminal Code*, the relevant portion of which reads as follows:

> **SECTION 268.**
> *Aggravated assault*
> 268. (1) Every one commits an aggravated assault who wounds, maims, disfigures or endangers the life of the complainant.
> *Punishment*
> (2) Every one who commits an aggravated assault is guilty of an indictable offence and liable to imprisonment for a term not exceeding fourteen years.

21.    Section 265 of the *Criminal Code* sets out the offence of assault and stipulates at subsection 2 that it applies to all forms of assault, which includes the offence of "aggravated assault". Section 265 reads as follows:

> **SECTION 265**
> *Assault*
> 265. (1)  A person commits an assault when
>      (a)  without the consent of another person, he applies force intentionally to that other person, directly or indirectly;
>      (b)  he attempts or threatens, by an act or a gesture, to apply force to another person, if he has, or causes that other person to believe on reasonable grounds that he has, present ability to effect his purpose; or
>      (c)  while openly wearing or carrying a weapon or an imitation thereof, he accosts or impedes another person or begs.

11

*Application*
(2)  This section applies to all forms of assault, including sexual assault, sexual assault with a weapon, threats to a third party or causing bodily harm and aggravated sexual assault.

*Consent*
(3)  For the purposes of this section, no consent is obtained where the complainant submits or does not resist by reason of

> (a) the application of force to the complainant or to a person other than the complainant;
> (b) threats or fear of the application of force to the complainant or to a person other than the complainant;
> (c) fraud; or
> (d) the exercise of authority.

*Accused's belief as to consent*
(4)  Where an accused alleges that he believed that the complainant consented to the conduct that is the subject-matter of the charge, a judge, if satisfied that there is sufficient evidence and that, if believed by the jury, the evidence would constitute a defence, shall instruct the jury, when reviewing all the evidence relating to the determination of the honesty of the accused's belief, to consider the presence or absence of reasonable grounds for that belief.

22.    Therefore, the maximum sentence were REYNOLDS to be convicted of aggravated

assault is 14 years.

## DISCHARGE FIREARM ENDANGER LIFE *CRIMINAL CODE* s. 244(b)

23.    The offence of "discharge firearm endangering life" is set out in s. 244(b) of the *Criminal*

*Code* and read as follows at the time REYNOLDS is alleged to have committed the offence[2]:

---

[2]  Section 244 of the *Criminal Code* was amended and these amendments came into force May 1, 2008, but these amendments will not apply to the prosecution of REYNOLDS because he will be tried under the section which was in effect at the time he committed the offence. If the new provision contained a lesser punishment, he would

12

**SECTION 244.**
*Causing bodily harm with intent – firearm*
244. Every person who, with intent
    (a) to wound, maim or disfigure any person,
    (b) to endanger the life of any person, or
    (c) to prevent the arrest or detention of any person,
discharges a firearm at any person, whether or not that person is the person mentioned in
paragraph (a), (b) or (c), is guilty of an indictable offence and liable to imprisonment for a
term not exceeding fourteen years and to a minimum punishment of imprisonment for a
term of four years.

24.    As noted above in paragraph 13, a firearm is defined by s. 2 of the *Criminal Code* as

follows:

> **"Firearm"** means a barrelled weapon from which any shot, bullet or other projectile can
> be discharged and that is capable of causing serious bodily injury or death to a person,
> and includes any frame or receiver of such a barrelled weapon and anything that can be
> adapted for use as a firearm.

25.    Thus if convicted of the offence of Discharging a Firearm Endangering Life,

REYNOLDS would be subject to a minimum sentence of four years and a maximum of 14 years.

**ASSAULT WITH A WEAPON** *CRIMINAL CODE* **s. 267(a)**

26.    The offence of "assault with a weapon" is set out in s. 267(a) of the *Criminal Code* and

reads as follows:

> **SECTION 267**
> *Assault with a weapon or causing bodily harm*
> 267.    Every one who, in committing an assault,

---

have been entitled to the benefit of that lesser punishment, but in fact the new legislation increases the penalties thus
REYNOLDS is entitled to the benefit of the lesser punishment which was in effect at the time he allegedly
committed this offence.

13

(a) carries, uses or threatens to use a weapon or an imitation thereof, or
(b) causes bodily harm to the complainant,
is guilty of an indictable offence and liable to imprisonment for a term not exceeding ten years or an offence punishable on summary conviction and liable to imprisonment for a term not exceeding eighteen months.

27.     As noted above, "weapon" is defined so as to include "any thing used, designed to be used or intended for use in causing death or injury to any person, or for the purpose of threatening or intimidating any person and, without restricting the generality of the foregoing, includes a firearm".

28.     Section 265 of the *Criminal Code* sets out the offence of assault and stipulates at subsection 2 that it applies to all forms of assault, which includes the offence of "assault with a weapon". Section 265 is set out above at paragraph 21. Thus for the offence of assault with a weapon, REYNOLDS would be subject to a maximum sentence of 10 years if convicted.

## POINTING A FIREARM *CRIMINAL CODE* s. 87

29.     The offence of "pointing a firearm" is set out in s. 87 of the *Criminal Code* and reads as follows:

SECTION 87.
*Pointing a firearm*
87. (1) Every person commits an offence who, without lawful excuse, points a firearm at another person, whether the firearm is loaded or unloaded.
*Punishment*
(2) Every person who commits an offence under subsection (1)
    (a) is guilty of an indictable offence and liable to imprisonment for a term not exceeding five years; or

14

(b) is guilty of an offence punishable on summary conviction.


30.      Thus for the offence of pointing a firearm, REYNOLDS would be subject to a maximum

sentence of 5 years if convicted.


## USE FIREARM IN COMMISSION OF INDICTABLE OFFENCE, CRIMINAL CODE s. 85 (1)


31.      Section 85 of the *Criminal Code* makes it an offence to use a firearm in the commission

of an indictable offence.  Thus the Crown must first prove that the accused has commited an

indictable offence and then prove the use of the firearm in the course of that offence.  If

convicted of this offence, the accused is subject to a mandatory minimum sentence of one year

for a first offence and a mandatory minimum sentence of three years for a second or subsequent

offence.  Certain offences are excluded from the operation of s.85, because their penalty sections

call for higher mandatory minimum sentences if a firearm was used in their commission.  Section

85 read as follows at the time REYNOLDS allegedly committed the offences[3]:


           **SECTION 85.**
           *Using firearm in commission of offence*


-------------------------------------------------------

    [3]  Section 85 of the *Criminal Code* was amended and these amendments came into force May 1, 2008, but
these amendments will not apply to the prosecution of REYNOLDS because he will be tried under the section which
was in effect at the time he committed the offence.  If the new provision contained a lesser punishment, he would
have been entitled to the benefit of that lesser punishment, but in fact the new legislation increases the penalties thus
REYNOLDS is entitled to the benefit of the lesser punishment which was in effect at the time he allegedly
committed this offence.

15

85. (1) Every person commits an offence who uses a firearm

    (a) while committing an indictable offence, other than an offence under section 220 (criminal negligence causing death), 236 (manslaughter), 239 (attempted murder), 244 (causing bodily harm with intent - firearm), 272 (sexual assault with a weapon) or 273 (aggravated sexual assault), subsection 279(1) (kidnapping) or section 279.1 (hostage-taking), 344 (robbery) or 346 (extortion),

    (b) while attempting to commit an indictable offence, or

    (c) during flight after committing or attempting to commit an indictable offence, whether or not the person causes or means to cause bodily harm to any person as a result of using the firearm.

*Using imitation firearm in commission of offence*

    (2) Every person commits an offence who uses an imitation firearm

        (a) while committing an indictable offence,

        (b) while attempting to commit an indictable offence, or

    (c) during flight after committing or attempting to commit an indictable offence, whether or not the person causes or means to cause bodily harm to any person as a result of using the imitation firearm.

*Punishment*

    (3) Every person who commits an offence under subsection (1) or (2) is guilty of an indictable offence and liable

    (a) in the case of a first offence, except as provided in paragraph (b), to imprisonment for a term not exceeding fourteen years and to a minimum punishment of imprisonment for a term of one year;

    (b) in the case of a first offence committed by a person who, before January 1, 1 R.S.C. 1985, c. C-38, s. 978, was convicted of an indictable offence, or an attempt to commit an indictable offence, in the course of which or during flight after the commission or attempted commission of which the person used a firearm, to imprisonment for a term not exceeding fourteen years and to a minimum punishment of imprisonment for a term of three years; and

    (c) in the case of a second or subsequent offence, to imprisonment for a term not exceeding fourteen years and to a minimum punishment of imprisonment for a term of three years.

*Sentences to be served consecutively*

    (4) A sentence imposed on a person for an offence under subsection (1) or (2) shall be served consecutively to any other punishment imposed on the person for an offence arising out of the same event or series of events and to any other sentence to which the person is subject at the time the sentence is imposed on the person for an offence under subsection (1) or (2).

32.    As noted above, "firearm" is defined as "a barrelled weapon from which any shot, bullet or

16

other projectile can be discharged and that is capable of causing serious bodily injury or death to a person, and includes any frame or receiver of such a barrelled weapon and anything that can be adapted for use as a firearm".

33.    If REYNOLDS is convicted of an offence under section 85 of the *Criminal Code*, he would be subject to a mandatory minimum sentence of one year in prison, in addition to the penalty for the underlying offence in which he used the firearm.

## D.    NO LIMITATION PERIOD IN THIS CASE

34.    In Canada there is no statutory limitation period of general application in respect of indictable offences.  No particular limitation period applies to the offences at issue in this case.  In Canadian law, the rule relating to the prosecution of the indictable offences is that, in the absence of a specific statutory provision to the contrary, the initiation of a prosecution of an indictable offence is not barred by the passage of any period of time.

## E.    OPINION

35.    I have carefully read and reviewed the Information charging the accused, Anthony REYNOLDS, with the offences set out in paragraph 6 supra.

36.    I have reviewed the Warrant of Arrest for the accused, Anthony REYNOLDS.

17

37.    I have carefully read and reviewed the affidavit of Darren Townley.

38.    In Canada, in order to find an accused guilty of an offence contrary to the *Criminal Code*, the trier of fact must be satisfied that the guilt of the accused has been established beyond a reasonable doubt.

39.    In my opinion, the evidence disclosed by the affidavit of Darren Townley, and the Exhibits attached thereto, make out a *prima facie* case of the guilt of Anthony REYNOLDS on the counts outlined in paragraph 6 above.  That is to say, a reasonable jury, properly instructed in the law, could on that evidence find beyond a reasonable doubt that Anthony REYNOLDS is guilty of the charges set out in paragraph 6 above, contrary to the *Criminal Code of Canada*.  I am also of the opinion that these offences are properly triable in the Province of Ontario, and that the criminal courts in the Province of Ontario have jurisdiction to try Anthony REYNOLDS for these offences.

40.    As a matter of Canadian Constitutional Law, offences under the *Criminal Code of Canada* are prosecuted by provincial law officers of the Crown.  In Ontario, the Ministry of the Attorney General of Ontario is responsible for all such prosecutions.  The Attorney General of Ontario thereby has, under s. 77 of the *Extradition Act*, Statutes of Canada, 1999, Chapter 18, as amended, the authority to make an extradition request in the present case.

41.    The offences listed in paragraph 6 above, are not political offences or offences of a political

18

character. The offences were not charged for the purpose of prosecuting Anthony REYNOLDS on account of his race, religion, nationality or political opinion. If returned to Canada, Anthony REYNOLDS will not be prejudiced by reason of his race, religion, nationality or political opinion.

42. This affidavit is made in good faith in support of a request by Canada for the extradition of Anthony REYNOLDS for the aforementioned criminal offences, and is made for no improper purpose.

SWORN BEFORE ME at the City )
of Toronto in the Toronto Region )
in the Province of Ontario, Canada )
this *16* day of *June* , )
)
)
)

Commissioner, etc

*Ian D. Scott*

                                                          _____
                                                                JANET GALLIN

THE MATTER of the request by Canada
for the extradition of ANTHONY REYNOLDS

---

**AFFIDAVIT OF JANET GALLIN**

---

**MINISTRY OF THE ATTORNEY GENERAL
FOR THE PROVINCE OF ONTARIO**
Crown Law Office – Criminal
720 Bay Street, 10th Floor
TORONTO, Ontario
M5G 2K1

**Janet Gallin**
Tel: 416-326-2303
Fax: 416-326-4656
Email: Janet.Gallin@ontario.ca

| CANADA | ) | HER MAJESTY THE QUEEN |
| PROVINCE OF ONTARIO | ) | VS |
| TORONTO REGION | ) | ANTHONY REYNOLDS |

IN THE MATTER of the request by Canada for the extradition of Anthony REYNOLDS from the United States of America with respect to offences under the *Criminal Code of Canada*

---

### AFFIDAVIT OF DARREN TOWNLEY

---

I, DARREN TOWNLEY, of the City of Toronto, in the Province of Ontario, a police officer, MAKE OATH AND SAY AS FOLLOWS:

1.      I am a member of the Toronto Police Service and have been so employed since May 1991. I presently hold the rank of Detective and I am assigned to the 31 Division Criminal Investigation Bureau in a plainclothes capacity.

2.      I am currently the primary investigator in the case of Regina v. Anthony REYNOLDS. I have been involved in this investigation since December 22, 2005. I have read the case file in relation to this matter and have reviewed other officers' notes. I therefore have personal knowledge of contents of this affidavit except where my knowledge is based on information and belief in which case I have identified the source of my information and belief.

### A.      CHARGES FOR WHICH EXTRADITION IS SOUGHT

3.      Canada is seeking the extradition of Anthony REYNOLDS (hereinafter "REYNOLDS" or "the accused" for the offences listed below, all of which occurred at Weston Road and Church Street, in the City of Toronto, Toronto Region, Ontario, Canada, on or about December 22, 2005:

    a.      Attempted Murder *Criminal Code*, section 239 (count 1)

b.    Attempted Murder While Using a Firearm *Criminal Code*, section 239(a) (count 2)

c.    Aggravated Assault *Criminal Code*, section 268 (count 3)

d.    Discharge Firearm Endanger Life *Criminal Code*, section 244(b) (count 4)

e.    Assault With a Weapon *Criminal Code*, section 267(a) (count 5)

f.    Pointing a Firearm *Criminal Code*, section 87 (count 6)

g.    Using Firearm while committing Aggravated Assault *Criminal Code*, section 85 (count 7)

h.    Using Firearm while committing Assault with a Weapon *Criminal Code*, section 85 (count 8)


4.    The accused was originally charged in an information (Information #1) which I swore on May 4, 2006 and a warrant was issued for the arrest of Anthony REYNOLDS by His Worship Justice of the Peace Stephen WAISBERG of the Ontario Court, Provincial Division. The warrant was issued with an Ontario wide radius. Subsequently the radius of the Warrant was extended to be a Canada wide warrant. A certified true copy of the information sworn on May 4, 2006 accompanies this, my affidavit and is marked as Exhibit "A". A certified true copy of the Warrant for Arrest accompanies this, my affidavit and is marked as Exhibit "B".

5.    On the advice of Crown counsel a second information was sworn on April 17, 2008, but again on the advice of Crown counsel a third information was sworn on May 2, 2008 by Police Officer Gary Sangha before Justice of the Peace Robert H. Lewin. Canada seeks REYNOLDS extradition on the counts set out in this third Information. A certified true copy of the third information sworn on May 2, 2008 accompanies this, my affidavit and is marked as Exhibit "C". The warrant for arrest on the first Information remains in force (Exhibit "B").

3

## B.    BRIEF SUMMARY OF THE OFFENCES

6.      As outlined in more detail below, the victim of this offence was Felix TWUM. The victim was involved in selling a used car to REYNOLDS (who he knew by the alias Oval THOMPSON).  The deal fell through and the victim refused to refund $500 to REYNOLDS, who wanted the money back.  Subsequently, on December 19, 2005, the two got into a physical altercation about the money and the victim hit REYNOLDS several times in the face.  Three days later, on December 22, 2005, REYNOLDS drove up to the victim, said "fuck you" and shot him with a handgun.  The victim tried to reach his own vehicle, but REYNOLDS shot him again. REYNOLDS then fled the scene in a black SUV, leaving the victim lying in the street.

7.      The police received information that "Oval THOMPSON'S" real name was Anthony REYNOLDS.  The victim was able to select REYNOLDS' driver's licence picture from a photo line-up as the man who shot him.  Other witnesses also identified REYNOLDS' picture as that of the man they knew as Oval THOMPSON, who was involved in the used car transaction with the victim.

8.      The police located a total of two 9mm shell casings and three 9mm projectiles and 1 copper jacket at the scene of the crime, suggesting that at least three shots were fired.

9.      The victim was shot two or three times, but no bullets lodged in his body.  He is now a paraplegic, lost a kidney, and has damage to his lungs and liver.

## C.    MORE DETAILED OVERVIEW OF INVESTIGATIONS PERTAINING TO OFFENCES

10.     I have reviewed the reports and officer's notes in regards to this occurrence and gathered the following information.

11.     Police Constable DYKE #7848 and Police Constable MACKEY #8479 are members of the Toronto Police Service and at the time of this occurrence were performing their duties together in 31 Division in the Community Response Unit.

a.      On Thursday the 22 of December 2005 Police Constable DYKE and Police

4

Constable MACKEY were working in a uniform capacity patrolling the boundaries of 31 Division.

b.    At about 4:42pm Police Constable DYKE and Police Constable MACKEY responded to a radio call detailed from the Toronto Police Communications center, this call was designated as event #L96038. The call was for a sound of gunshots at Weston Road and Church Street, in the City of Toronto

c.    When officers arrived on scene they observed a crowd of people at the Plaza located on the southeast corner of Weston Road and Church Street. The crowd was waving the officers to their location

d.    When the officers pulled into the plaza they observed a male hereafter referred to as the victim lying on his side near the plaza entrance/exit at Church Street.

e.    The Officers observed that the victim was bleeding from the area of his lower back and waist area and commenced first aid

f.    Officers while applying first aid noticed apparent gunshot wounds in the victim's buttock, lower back and upper right chest.

g.    The victim identified himself as Felix TWUM and advised he was 26 years old

h.    At this time ambulance number 853 attended the scene and took over medical treatment of the victim.

i.    Shortly after, additional police officers arrived to take over the protection and preliminary investigation at the scene.

j.    Police Constable MACKEY received information from a citizen that the suspect was a black male, operating a black Pathfinder motor vehicle.

k.    Police Constable DYKE rode in the rear of the ambulance with the victim. During the ride in the ambulance Police Constable DYKE asked the victim several questions in regards to the suspect and his last known direction of travel. The

5

victim advised at this time that he did not know.

l.  Once on scene at Sunnybrook hospital several Doctors including Dr Russell MacDonald treated the victim. Dr Macdonald advised that there were numerous bullet entrance/exit wounds however there were no bullets in the victim's body. It was believed that the victim had been shot between 2-3 times and he was possibly paralyzed from the waist down.

m.  Police Constable DYKE then reported that the victim was taken to Sunnybrook operating room #1 M2 220 to be operated on.

12.  Police Constable TAVARES #7744 is a member of the Toronto Police Service and on Thursday the 22nd of December 2005 Police Constable TAVARES was working in a uniformed capacity attached to "A" platoon patrolling the boundaries of 31 Division

a.  at about 4:42pm Police Constable TAVARES received a radio call to attend the Weston Road and Church Street area in Toronto in regards to a call for service for a shooting

b.  Police Constable TAVARES arrived on scene and was detailed to tape off the area to protect the scene and then to canvass the area for potential witnesses and evidence of the offence.

c.  Police Constable TAVARES received information from a citizen that someone from the Moonshine Salon, which is the premise the victim had exited just prior to being shot had taken the victim's phone. The citizen advised that this male was a male black with an afro and a yellow shirt

d.  Police Constable TAVARES attended the salon and spoke to the male who handed over the Sony Ericsson cellular phone belonging to the victim. This male identified himself as George NELSON with a date of birth of 1963/06/30.

e.  Police Constable TAVARES canvassed the area and spoke with several citizens

who had heard the gunshots and observed a black van or sports utility vehicle
fleeing the scene.

f.       Police Constable TAVARES then re-attended the Moonshine Salon and spoke to
the owner Dennis JOHNSON with a date of birth of 1976/02/10. Mr. JOHNSON
advised that the victim was a regular customer of his and that the victim had
attended the barbershop for a "clean-up". Mr. JOHNSON further advised that
when the victim left the barbershop he heard a couple of bangs and saw him lying
on the floor. Police Constable TAVARES advised both Mr. JOHNSON and Mr.
NELSON to attend 31 Division for a statement.

g.       Police Constable TAVARES then stood by and guarded the crime scene.

h.       At about 11:00 pm Police Constable TAVARES accompanied the victim's vehicle
#AXEV-178 a Mercedes Benz to the Toronto Police Forensic Identification
offices on Jane Street in the City of Toronto.

13.    Police Constable Maclean #9039 is a member of the Toronto Police Service and on
Thursday the 22nd of December was working in a uniform capacity attached to "A" platoon
patrolling the boundaries of 31 Division. Police Constable MACLEAN was working as Police
Constable TAVARES' escort on this date.

a.       at about 4:42pm Police Constable MACLEAN received a radio call to attend the
Weston Road and Church Street area in Toronto in regards to a call for service for
a shooting

b.       When Police Constable MACLEAN arrived on scene, he observed a blue
Mercedes and the victim lying in close proximity to it.

c.       At about 4:58pm Police Constable MACLEAN interviewed a witness who
identified himself as Robert PENNY. MR. PENNY advised that he was in the area
of Church Street and Weston Road and heard what he believed to be
approximately seven gunshots. At this time he turned and observed a black male

7

with a toque pulled down over his ears operating a black Ford 4X4. Mr. Penny advised that the black male was the only occupant in the vehicle and he "whipped" by him not looking at traffic, drove out onto Weston Road and went northbound in the south bound lanes cutting traffic off.

d.     Police Constable MACLEAN was then detailed by Sergeant RAMJATTAN #2360 to record all of the license plate numbers of the vehicles parked in the lot at Weston Road and Church Street.

e.     At about 5:10 pm Police Constable MACLEAN accompanied Police Constable TAVARES into the Moonshine Salon and spoke with George NELSON the male who had taken the victim's phone after the shooting.

f.     Police Constable MACLEAN and TAVARES then guarded the scene

g.     At about 10:28 pm Police Constable MACLEAN sealed the victim's Mercedes with police seals

    i)     Front driver's door-956537

    ii)    Front passenger door- 956538

    iii)   Trunk-956539

    iv)    Hood-956540

h.     At about 11:00 pm Mechanic HARRIS of Toronto Police Jane Garage transported the victim's car #AXEV-179 a Mercedes Benz to the Toronto Police Forensic Identification Services garage at 2050 Jane Street for Forensic exam.

14.     At about 5:34 pm, I along with Detective Constable HOPKINS #8058 attended the crime scene at Weston Road and Church Street (2159 Weston Road). Detective Constable HOPKINS is employed by the Toronto Police Service and currently assigned to the 31 Division Criminal Investigative Bureau.

8

a.    At about 5:20 pm while on route to the crime scene I received information from
      Police Constable Gord WONG#8483 who is a member of the Toronto Police
      Service. Police Constable WONG advised me that he was at Sunnybrook Hospital
      with the victim. I advised Police Constable WONG to contact me again when he
      had an update on the victim's condition.

b.    At about 5:23 pm I notified Detective Constable HUBBARD of Toronto Police
      Forensic Identification Services of the incident and requested that they attend the
      scene.

c.    At about 5:32pm I received another call from Police Constable WONG advising
      that the victim had been shot several times and was in a life threatening condition.

d.    Once on scene I spoke with Sergeant Rick RAMJATTAN#2360 who advised that
      the victim had been transported to Sunnybrook Hospital and that Police Constable
      DYKE had gone with the victim in the ambulance. Police Constable MACKEY
      was also enroute to Sunnybrook Hospital

e.    I observed that crime scene tape was up to protect the crime scene and to prevent
      any unauthorized persons from entering the scene. I requested that the scene be
      expanded to include the entire parking area of 2159 Weston Road.

f.    Sergeant RAMJATTAN had already commenced canvassing and I requested that
      he detail officers to check for video in the area as well as canvassing all
      businesses and residential units in the area.  No video of the incident was
      recovered.

g.    I received information from Police Constable PAT MEEHAN #3265 that the
      victim had attended the Moonshine salon at 4 Church Street prior to being shot. I
      received further information that several witnesses were attending 31 Division for
      video statements.

h.    I observed a vehicle, a blue Mercedes Benz Convertible Ontario License Plate

#AXEV-178 parked facing southbound against the west wall of the Weston Drug Mart. I was advised that this was the victim's vehicle.

i.    I observed on this vehicle what appeared to be fresh scrapes to the rear passenger side wheel well as well as scrapes to the area behind the passenger door. I also noticed what appeared to be fresh damage to the passenger rear view mirror and signal indicator. It appeared that the vehicle had just been struck by another vehicle as there was fresh debris on the ground.

j.    I observed on the west wall of the Drug Mart what appeared to be two bullet holes

k.    I observed what appeared to be two shell casings near the rear of the victim's car, a pile of clothing and what I believed to be blood stained snow

l.    Numerous statements were taken from witnesses at the scene by officers, the witnesses described a black sports utility vehicle fleeing the scene with a lone male black driver

m.    At about 6:15 pm I left the scene to attend 31 Division in order to interview the witnesses who had been sent there.

n.    At about 6:42 pm Detective Constable HOPKINS and I took a video statement from the witness Linda TAIT. Linda TAIT stated she was in the area at the time of the shooting and heard several gunshots. Linda then advised that she observed a black Ford truck fleeing the scene with a male black driver wearing a toque

o.    At about 7:05 pm Detective Constable HOPKINS and I interviewed George SELKIRK who was in the area in his vehicle on Church Street at the time of the shooting. George SELKIRK while in the area heard what he believed "backfires" that sounded like a high powered revolver. Mr. SELKIRK then advised that shortly after he heard the "backfires" he observed a black sports utility vehicle northbound on Weston Road in the southbound lanes suddenly turn onto east bound Church Street and slid almost striking his vehicle. Mr. Selkirk advised that

he observed a lone male black driver.

p.    At about 7:25 pm Detective Constable HOPKINS and I interviewed Lynne
MAITLAND who was in the area at the time of the shooting. Ms MAITLAND
advised that while in the area she heard several gunshots and observed a black
sports utility vehicle driven by a lone male black wearing a toque fleeing the
scene.

q.    At about 9:46 pm Detective Constable HOPKINS and I interviewed George
NELSON who is an employee of the Moonshine Salon. Mr. NELSON reported
that the victim whom he knows at "FRANKIE" was in the barber shop prior to
being shot, getting his hair cut. Mr. NELSON advised that after the victim left the
barber shop he heard 5-6 gunshots and when he looked out the window, the victim
was lying on the ground. Mr. NELSON then advised that he went over to the area
where the victim was lying and took his phone as he was having seizures. Mr.
NELSON reported he brought the victim's cell phone back to the shop and later in
the evening turned it over to a police officer.

r.    At about 10:12 pm Detective Constable HOPKINS and I interviewed Dennis
JOHNSON, the owner of the Moonshine Salon. Mr. JOHNSON reported that the
victim whom he knows as "FRANKIE" came in to get a haircut. When the victim
left, Mr. JOHNSON heard several gunshots and when he looked outside, the
victim was lying on the ground speaking on his cellular phone.

15.    Detective Constable Todd CAREFOOT # 798 is a member of the Toronto Police Service
and currently carries out his duties as a member of Forensic Identification Services (F.I.S).
Detective Constable CAREFOOT's duties include documenting, photographing, and gathering
evidence at crime scenes.

a.    On Thursday the 22nd of December 2005 at about 7:09 pm Detective Constable
CAREFOOT attended the crime scene at Weston Road and Church Street at the
location the victim Felix TWUM was shot. Detective Constable CAREFOOT

attended with another F.I.S officer Detective Constable HUBBARD #3999.

b.  Once on scene Detective Constable Carefoot was allowed access to the scene by Police Constable TAVARES who was in charge of protecting it.

c.  Detective Constable CAREFOOT upon his arrival conducted a general search of the area for evidence.

d.  Detective Constable CAREFOOT examined the victim's vehicle plate #AXEV178 (two door blue Mercedes Benz CLK convertible)

e.  While examining the vehicle Detective Constable CAREFOOT noted the following: a scrape around the wheel well on rear passenger side, large scrapes just to rear of passenger door, the passenger rearview mirror and signal light affixed to the mirror appeared pushed forward and broken

f.  Detective Constable CAREFOOT also noticed on the rear wall behind the victim's vehicle there appeared to be two bullet holes in the bricks of the Weston Road Drug Mart.

g.  Detective Constable CAREFOOT also noted broken glass in the parking lot near the front passenger side of the victim's vehicle as well as pieces of a broken mirror at the bottom of the windshield of the vehicle.

h.  Detective Constable CAREFOOT noted a 9mm empty casing on the pavement to the rear of the victim's car as well as another empty 9mm casing near the corner of the pharmacy where the victim's car was parked.

i.  Detective Constable CAREFOOT also observed what appeared to be a copper jacketed projectile on the pavement near the rear of the victim's car

j.  Detective Constable CAREFOOT observed a pile of the victim's clothing on the pavement near the drug store wall and bloodstains in the snow near the corner of the drugstore wall.

12

k.     Detective Constable CAREFOOT then noted another copper jacketed projectile on the snow between the drug mart and Church street, and another copper jacketed projectile just North of the drug stores wall

l.     Detective Constable CAREFOOT then noted finding copper jacketing on the pavement near the front passenger side of the victim's vehicle

m.     The casings, projectiles and jacketings recovered suggest that at least three shots were fired.

n.     Detective Constable CAREFOOT and his escort Detective Constable HUBBARD # 3999 processed the scene and gathered all evidence, which had been found.

16.     Detective Constable Simon HUBBARD #3999 is a member of the Toronto Police Service and currently carries out his duties as a member of Forensic Identification Services (F.I.S). Detective Constable HUBBARD's duties include documenting, photographing, and gathering evidence at crime scenes.

a.     On Thursday the 22nd of December 2005 at about 7:09 pm Detective Constable HUBBARD attended the crime scene at Weston Road and Church Street at the location the victim Felix TWUM was shot. Detective Constable HUBBARD attended with another F.I.S officer Detective Constable CAREFOOT #798)

b.     Detective Constable HUBBARD videotaped the crime scene and assisted Detective Constable CAREFOOT in processing evidence.

17.     Detective Larry REBELLATO #793 is a member of the Toronto Police Service and currently carries out his duties at 31 Division in the Criminal Investigative Bureau.

a.     On December 27th, 2005 Detective REBELLATO #793 in company with Detective Constable LUZCYK #8626 and Detective Constable WELLS #8327 attended Sunnybrook Hospital to interview the victim Felix TWUM in regards to the shooting.

13

b.      The victim reported that he assists people in buying used vehicles from Roy Foss
        Motors and receives referral fees and "a little extra" for arranging the car deals.

c.      The victim reported that he works for a friend at the dealership called Roy
        PARKER

d.      The victim reported that about two weeks prior to the shooting the person who
        shot him approached him and wanted to purchase a vehicle and register it in a
        female's name.  At the time of this interview, the victim could not recall the
        purchaser's name.

e.      The victim reported that the car deal was initially approved and the insurance for
        the vehicle was approved but there was a problem when it was discovered that the
        purchaser did not have a driver's licence.

f.      The victim reported that he was paid his $500.00 commission by the purchaser.

g.      The victim reported that when the purchaser attended the dealership to pick up the
        vehicle there was a problem plating the vehicle as the purchaser did not have a
        driver's licence.

h.      The purchaser then advised the accused that he wanted his $500.00 back as the
        deal had not been consummated. The victim refused to return the money and
        advised that he had done his part of the deal.

i.      The victim then advised the purchaser that he had 30 days to "get yourself into
        another car" so the insurance does not cancel and could be transferred to another
        car.

j.      The victim advised that he had obtained the purchaser's name and information.

k.      The victim then advised that the purchaser had produced his information
        including a driver's licence and this document was photocopied.

14

l.    The victim stated that the purchaser advised him that he was from Miami.

m.    The victim reported that about three days later, on the Monday prior to being shot (Monday the 19th of December 2005), he was approached by the purchaser in a plaza in the Yonge Street and Sheppard Avenue area. The purchaser grabbed him by the shirt and while he had the victim by the shirt he had his other hand in his back pocket like he was carrying something there. The purchaser at this time asked where his money was. The victim then went to leave the parking lot in his vehicle but the purchaser blocked it with his own vehicle. The victim then advised that he exited his vehicle and punched the purchaser twice, breaking his nose. The purchaser then again requested his money back.

n.    The victim then reported that the following day that he received a call from the purchaser who advised that he went to see a doctor and his nose was broken as a result of being struck by the victim. The purchaser then said that he was in the wrong for confronting the victim.

o.    The victim then reported that on Thursday (December 22nd, 2005) he left the barber shop at Church Street and Weston Road and observed the purchaser in a vehicle. The victim observed the headlights on the vehicle come on and he pulled out. The purchaser pulled up to the victim and rolled down his window, removed a gun, looked left and right and said "Fuck You". The purchaser then started shooting at him. The victim advised that the first shot struck him and he attempted to run away and get into his vehicle.  The purchaser then turned around and shot him again.

p.    The victim advised that the person who shot him was the same person who he had dealt with previously in the purchase of the vehicle and who he had the confrontation with at the plaza at Yonge Street and Sheppard Avenue.

q.    The victim described the suspect as a black male, 5'8", ugly with a big nose, slim build, 110lbs, about 26yrs old or older, black hair.

r.   The victim reported that his injuries as a result of the shooting included the following: the victim lost a kidney, has a damaged liver and damaged lungs and the victim is now a paraplegic.

s.   The victim advised he could eventually give the police the name the purchaser gave him at the time of the car transaction, but he could not provide the name at the time of the interview.

t.   The victim described the handgun used to shoot him as a "nine" (street slang describing a 9mm handgun) or a "forty" (street slang describing a .40 calibre handgun) handgun possibly a Glock (Glock is a brand of handgun.)

u.   The victim advised that the person who shot him had on previous meetings been operating a black SUV with Florida Plates from "Miami".

v.   The victim advised the person who shot him had previously contacted him on his cell phone number #647-219-6503

18.   Mr. Twum has a criminal record (14 Convictions) for various offences including Possession of Property Obtained by Crime, Fail to Attend Court, Fraud Under, Fraud Over, Assault with intent to resist arrest, Fail to Comply with Recognizance, Uttering a Forged Document, Obstruct Peace Officer, Possession of a Scheduled Substance, Possession of a Scheduled Substance for the Purpose of Trafficking and Fail to Comply with Undertaking. Mr Twum is also currently before the courts charged with Possession of Property obtained by Crime and Possession of Credit Card Obtained by Crime X3.

19.   Detective Constable Richard LUCZYK #8626 is a member of the Toronto Police Service and at the time of this investigation was working at 31 Division in the Criminal Investigative Bureau

a.   On December 27th 2005 Detective Constable LUCZYK attended the Esso gas station located at Yonge Street and Sheppard Avenue in the City of Toronto to receive surveillance video of the altercation between the suspect and victim days

16

prior to the shooting.

b.    Detective Constable LUCZYK spoke with the manager of the Esso gas station Evelyn BACCUS who advised Detective Constable LUCZYK to return later in the day to retrieve the surveillance video.

c.    At about 1:13 am Police Constable LUCZYK attended the gas station and retrieved the surveillance video. The video was assigned Toronto police property tag #N344681.

d.    This video was viewed, and the altercation was not observed as the cameras show only the gas pump and cashier areas of the station.

20.    Detective Constable Duncan MILLER #4216 is a member of the Toronto Police Service and currently works at 31 Division in the Criminal Investigative Bureau

a.    On December 29th 2005 at about 1:34pm Detective REBELATTO and Detective Constable MILLER attended North York Chev Olds Dealership at 7200 Yonge Street in Richmond Hill for the purposes of interviewing Roy PARKER

b.    The North York Chev Olds Dealership is the location where there was an attempt to purchase a vehicle using false identification under the name of Oval THOMPSON. The victim worked as a car broker at this location.

c.    Mr. PARKER advised he was employed by North York Chev Olds as a sales person for special financing dealing with customers with high risk credit ratings

d.    Mr. PARKER advised that he knew the victim as a broker who would bring customers to him and receive a referral fee.

e.    Mr. PARKER advised that the victim had brought in several clients including a male known as Oval THOMPSON sometime around December of 2005. Mr. PARKER advised he had met with "Oval THOMPSON" on several occasions in relation to the purchase of a Honda from the car lot.

17

f.     Mr. PARKER turned over paperwork to Detective REBELATTO in relation to the attempted car purchase by Oval THOMPSON.

g.     The paperwork handed over was for the purchase of a "99" Green Honda by a person identifying himself as:

       i)      THOMPSON, Oval, R

       ii)     Driver's License #T5837-62567-41217 (issued according to photocopy 2001/05/07)

       iii)    27 Marsh Lane, Ajax

       iv)    L1T-3W2

       v)     Phone #647-404-7781

h.     The paperwork included a photo copy of a counterfeit driver's license produced by the person claiming to be Oval THOMPSON (copy attached as Exhibit "D")

i.     Mr. PARKER advised that the driver's license produced under the name Oval THOMPSON was not registered with the Ministry of Transportation.

j.     Included in the package was a photocopy of proof of insurance produced by the purchaser for the vehicle he intended to purchase. Mr. PARKER advised that the proof of insurance was not faxed from the insurance company but from an unknown source. The proof of insurance was as listed below:

       i)      Insurance Company- Security National

       ii)     Policy Holder- Oval THOMSON

       iii)    Policy #75526079

       iv)    Valid From: Dec 9th, 2005

18

      v)       Expires; Dec 27th, 2005

      vi)     Vehicle: 1999 Honda Civic Se

      vii)    Vehicle Identification Number# 2HGEJ6515XH917529

k.      Also included in the package was a blank cheque provided by the purchaser as was required of him in the process of purchasing the vehicle.

      i)       Bank- Canada Trust

      ii)     Branch- 4111 Kingston Road, Scarborough

      iii)    Cheque #1)-  Account #0010544200483966313949

l.      Mr. PARKER advised that the purchaser did not have any cheques and he had referred him to a friend "FRANK" that works at the above mentioned Canada Trust to open an account. The above mentioned cheque was seized and submitted for forensic examination, but no relevant information was obtained.

m.     Another document in the package was a pay stub from the Moonshine Barber Shop in the name of Oval THOMPSON, as proof of employment. This document is needed to assist in the process of obtaining credit to purchase the vehicle.

n.      A photo copy of a social insurance number in the name of Oval THOMPSON was supplied to Mr. PARKER by the purchaser. The number on the Social Insurance Card was #504-851-319

o.      A check was run through Equifax of the purchaser in regards to the loan he was attempting to obtain to finance the vehicle. Equifax is a company which will check the credit history of loan applicants prior to the lenders approving the loan. The Equifax check revealed the driver's license and social insurance card provided by the purchaser were invalid.

p.      Mr. PARKER advised that because of the discrepancies with the purchaser's

identification the car deal fell through

q.  Mr. PARKER further advised that after the deal had fallen through he received
several calls from the purchaser who was trying to locate Felix TWUM.

r.  Mr. Parker advised that he would recognize the purchaser if he observed him
again and described him as the following:

i)  Black Male, 5'8"-9", 150 pounds, skinny build, medium complexion,
shaved head, Jamaican

21.  On December 29th, 2005 Detective REBELLATO #793 and Detective Constable
MILLER interviewed Justin FLEMING

a.  Justin FLEMING is an employee of the car dealership and works as an
administrative assistant. Mr. FLEMING handles cases in which persons wishing
to purchase vehicles are of a high financial risk. Mr. FLEMING conducts financial
background checks on prospective buyers.

b.  Mr. FLEMING knows the victim as a car broker and dealt with "Oval
THOMPSON" on several occasions around December 2005, while he was
attempting to purchase a Honda Motor vehicle.

c.  Mr. FLEMING showed Detective REBELATTO documents that were prepared at
the time of the proposed Honda purchase.

d.  Mr. FLEMING advised that a male identifying himself with an Ontario driver's
licence and social insurance card as Oval THOMPSON had applied for credit
through the dealership and was attempting to purchase a 1999 Honda motor
vehicle from the dealership. Mr. FLEMING obtained a photocopy of the
purchaser's driver's license and social insurance card.

e.  Prior to the deal being completed Mr. FLEMING reports that the purchaser pulled
him aside and advised him that his driver's license was "void" and "did not exist".

The purchaser advised he was giving him a "heads up" that when they attempted to obtain licence plates for the Honda the dealership may be unable to.

f.    Mr. FLEMING advised that the photograph on the driver's license produced by the purchaser was a true image of him.

g.    Mr. FLEMING advised that the deal was set to go through and the dealership was about to obtain licence plates for the vehicle, but with the recently discovered information from the purchaser the deal fell through.

h.    Mr. FLEMING describes the purchaser as the following:

    i)    Black Male, 5'5 to 5'6", 30-35 years old, 150lbs, skinny build, unshaven, makes what appears to be an involuntary noise with his throat.

    ii)    MR. FLEMING advised that he believes the photo on the driver's license as provided to him by the purchaser is an actual photo of that person.

22.    I ran checks through the police database as well as the Ministry of Transportation on the name of Oval THOMPSON and my results were that there were no records found on any database for that name.

23.    Detective Constable Ryan FORDE #86872 is a member of the Toronto Police Service and currently is attached to the Urban Organized Crime Squad.

a.    On Friday the 10th of February 2006 I received a call from Detective Constable FORDE who advised me that he had information on the shooting of the victim.

b.    Detective Constable FORDE advised that he had received information from a Confidential Informant that the person responsible for the shooting of the victim was a male by the name of Anthony Augustus REYNOLDS with a date of birth of 1977/09/22. The Informant advised that the suspect was associated to an address of 2085 Wilson St, Inisfil Ontario. The Informant advised that the suspect does not reside at this address.

21

   c.      The informant advised that the victim worked at a car dealership in the Yonge Street and Steeles Ave area.

   d.      The Informant stated that the victim provided REYNOLDS with false insurance for a vehicle he was going to purchase. The informant stated that the victim provides false insurance which is good for six months to persons who wished to purchase vehicles.

   e.      The Informant reported that the victim was shot by REYNOLDS over a dispute in regards to the transaction of the vehicle and insurance.

   f.      The Informant also stated that REYNOLDS operated a black Chevrolet Tahoe with unknown license plates.

   g.      Detective Constable FORDE advised that he had placed Anthony REYNOLDS on CPIC for observation

24.    I conducted checks on the police data base, the Ministry of Transportation data base and Immigration Canada Data Base on Anthony REYNOLDS and I received the following information:

   a.      REYNOLDS does not have a criminal record in Canada.

   b.      REYNOLDS was not facing any criminal charges in Canada

   c.      REYNOLDS had contact with Toronto Police on 2000/04/20 in which he reported an Assault and Theft Under (Toronto Police Occurrence #2000/0063683). I was the officer who took the report in 2000. In the aforementioned report he provided to police an address of 1084 Kensington St, Stroud, Ontario.

   d.      REYNOLDS held an Ontario driver's license:

       i)      REYNOLDS, Anthony, A

       ii)     Date of Birth-1977/09/22

22

iii)   Driver's License #R2988-05317-70922

iv)   Address: 2085 Wilson St, Inisfil, Ontario

e.   REYNOLDS is a Canadian Citizen who originally came to Canada from Jamaica on August 17th, 1996.

f.   REYNOLDS' sponsor in Canada was Paulette LEONARD-RICHARDS

25.   On Thursday the 23rd of February 2006, I received a driver's licence photograph of the accused Anthony REYNOLDS (Ontario Driver's License #R2988-05317-70922) from the Ministry of Transportation (see Exhibit "E").

a.   I examined the photograph from the Ministry of Transportation and compared it with the photograph of Oval THOMPSON in the photocopied loan application provided to Detective REBALATTO by Roy PARKER and Justin FLEMING (see Exhibit "D")

b.   I observed that both photographs appeared to be exactly the same

c.   I brought REYNOLDS' driver's licence photograph to the Toronto Police Forensic Identification Service for the purpose of preparing a photo line-up which included a photograph of Anthony REYNOLDS.

d.   The purpose of this photo line-up was to have the victim and witnesses view a group of photographs of similar looking persons. The series of photographs would include the Ministry of Transportation driver's license photograph of Anthony REYNOLDS

26.   Ms Joe ORSATTI #88178 is a civilian member of the Toronto Police Service and is currently attached to Forensic Identification Services: Computer Assisted Recovery Enhancement System section.

a.   Ms Joe ORSATTI is a Forensic Artist and is able to insert a Ministry of

Transportation driver's license photograph into a Toronto Police photo line-up

b.    Toronto Police line-up #06-001014 is a series of 11 booking photographs of persons who have been arrested by the Toronto Police Service. These persons are similar looking to Anthony REYNOLDS.

c.    Ms Joe ORSATTI inserted the driver's license photograph of Anthony REYNOLDS into Toronto Police line-up #06-001014

d.    After Ms Joe ORSATTI inserted the driver's license photograph of Anthony REYNOLDS into Toronto Police Line-Up #06-001014 it brought the total amount of photographs to 12.

e.    The photographs in line-up #06-001014 were arranged into twelve pictures on one page, three lines consisting of four pictures per line.

f.    Each photograph was sequentially numbered from #1-#12.

g.    The numbers identifying each photograph were placed above the image.

h.    Several copies of the photo line-up were generated with the photographs shuffled.

27.    On Monday the 27th of March 2006, Detective CARBONE and I attended the Lyndhurst Rehabilitation Center in Toronto for the purposes of showing a photo line-up, which included a picture of the accused Anthony REYNOLDS to the victim Felix TWUM (see Exhibit "F").

a.    The Toronto Police photo line-up was numbered 06-001014, the line-up consisted of 12 numbered photographs.

b.    REYNOLDS was in position #3 on the line-up

c.    At about 12:33pm Detective CARBONE showed the photo line-up to Felix TWUM

d.    The victim Felix TWUM picked out REYNOLDS' photograph in position #3 and

24

stated "that's the person that shot me, number three"

28.     Police Constable WAUCHOPE #8056 and Police Constable TUCKER #8198 are members of the Toronto Police Service and at the time of this occurrence were members of 31 Division Criminal Investigative Bureau.

a.     On Wednesday the 29th of March 2006 Police Constable WAUCHOPE and Police Constable TUCKER attended North York Chev Olds at 7200 Yonge Street for the purposes of showing Toronto Police photo line-up #06-001014 to Roy PARKER and Justin FLEMING, the employees of Roy Foss Motors to see if they could identify the person ("THOMPSON") who had attempted to purchase the Honda with Felix TWUM as the "broker". PARKER and FLEMING were shown different versions of the lineup, out of one another's presence.

b.     At about 11:45 am photo line-up #06-001014 was shown to Roy PARKER

c.     The photo line-up consisted of 12 numbered photographs, REYNOLDS' photograph was in position #8 of this line-up.

d.     The witness Roy PARKER stated "I cant make a positive one, he wasn't around that much, he only came around two to three times, if I had to guess I would say number twelve, but I'm not sure. I don't want to send this guy to jail for nothing, sorry man"

e.     Police Constable WAUCHOPE advised me that while making this statement the witness was actually pointing at the REYNOLDS' picture, which was #8. The accused photo in the #8 position was directly above the photo in the #12 position. The numeral #12 is directly below REYNOLDS' photograph. The witness mistakenly believed the photograph he picked was labeled #12. The witness when asked to sign the photo of the person he had picked out of the line-up signed REYNOLDS' photo in position #8.

f.     At about 11:56 am the witness Justin FLEMING was shown photo line-up

25

#06-001014. REYNOLDS' photograph in this line up was in position #9.

g.    The witness Justin FLEMING pointed to REYNOLDS' photograph and stated "number nine, the guy was a client once, tried to purchase a vehicle through this office, that is Thompson #9"

29.    On Thursday the 4th of May 2006 Detective Constable HOPKINS received information from Customs Officer McDANIAL of the United States Customs Service

a.    Officer McDANIAL is a United States Custom Officer and is in the Passenger Analytical Unit working out of Pearson International Airport.

b.    All passengers traveling to the United States from Pearson International Airport must pass through United States Customs which has a branch at Pearson International Airport.

c.    The U.S. Custom Service maintains a data base of persons traveling through border points in relation to the United States

d.    Officer McDANIAL advised that the accused Anthony REYNOLDS departed from West Palm Beach, Florida, United States of America on November 25th, 2005 and arrived in Toronto, Canada on the same day

e.    Officer McDANIAL advised that Anthony REYNOLDS was to return to West Palm Beach, Florida on December 5th, 2005, but rescheduled his airline ticket to a return date of December 23, 2005.

f.    Officer McDANIAL advised that on December 23rd, 2005 at 9:38 am, (the day after the shooting) Anthony REYNOLDS departed from Pearson International Airport on Air Canada flight number 936 bound for West Palm Beach, Florida

30.    On Thursday the 4th of May 2006 I attended the Toronto North Courts at 1000 Finch Ave West in the City of Toronto.

a.    I was seen by Justice of the Peace WAISBERG.

b.    I applied to obtain a Warrant in the First Instance for Anthony REYNOLDS arrest on the following charges:

    i)    Attempted Murder *Criminal Code* 239

    ii)    Attempted Murder While Using a Firearm *Criminal Code*, section, section 239(a)

    iii)    Aggravated Assault *Criminal Code*, section 268

    iv)    Discharge Firearm Endanger Life *Criminal Code*, section 244(b)

    v)    Assault With a Weapon *Criminal Code*, section 267(a)

    vi)    Possession of an Unregistered Restricted Weapon *Criminal Code*, section 91(1)

    vii)    Pointing a Firearm *Criminal Code*, section 87

    viii)    Unauthorized Presence of a Firearm in a Motor Vehicle *Criminal Code*, section 94(1)

    ix)    Attempt Fraud Over *Criminal Code*, section 380

c.    The warrant was granted by Justice of the Peace WAISBERG and Anthony REYNOLDS is currently wanted on the above mentioned charges. This Warrant is Canada Wide.

31.    On Thursday January 4th 2007 I spoke on the phone with a representative of Air Canada. Janine KHALE is an employee of Air Canada and currently works in the security department. I received the following information from her:

a.    Air Canada flight records are held in the Air Canada Reservation System. This system is a computerized system in which Air Canada uses to record and store

customer and flight information. The data of this system can be accessed through the Air Canada officers located at 7373 Cote Vertu West, Ville St Laurent, Montreal Quebec.

b.      A record is generated in the Air Canada Reservation System when a customer purchases a flight.

c.      The Air Canada Reservation System records information such as flight manifests, reservation files, confirmation of flight, customer address's and phone number as well as the method of payment made by the customer.

32.    On Monday the 15th of January 2007, I attended the Toronto North Courts and obtained a *Criminal Code* Search Warrant for the phone number of #647-404-7781, which "Oval Thompson" had provided as part of the vehicle transaction. I also obtained a *Criminal Code* Production Order for flight records pertaining to flights the accused had been a passenger on during the time period surrounding the offence. The warrants were endorsed by Judge L. MARSHALL a Provincial Court Judge for the Province of Ontario, Canada.

33.    On Wednesday the 21st of February 2007 I received the results of the search warrant executed on Rogers Wireless Inc. for the phone records for number of #647-404-7781.

a.      The subscriber information for this phone showed it had been obtained using the name of Robinson UCHENDU with an address of 3150 Erin Centre Blvd, Unit#92, Mississauga, Ontario, Canada

b.      I examined the records and observed two calls placed from this phone on December 13th 2005. The first call was placed at 1:33pm to #561-694-7776 and the second call was placed at 11:06pm to #561-632-7148.

c.      I checked these numbers on the internet using the website canada411.com. I received information that the #561 prefix or area code in these numbers identifies the phones as being based in Florida.

28

    d.     I also observed in the phone records that this phone had been used to phone the victim's cellular phone (#647-219-6503) seven times on December 14th, 2005

34.   Detective Constable Joel MANHERZ is a member of the 31 Division T.A.G. (Target Apprehension Group). The 31 T.A.G. group is responsible for maintaining and enforcing outstanding 31 Division warrants.

    a.     On Wednesday the 21st of February 2007, Detective Constable MANHERZ made a request to South Simcoe Police to attend two addresses associated to the accused in an attempt to apprehend and or determine where the accused was presently located.

    b.     The addresses Detective Constable MANHERZ requested South Simcoe Police attend were 1084 Kensington Street and 2085 Wilson Street. Both of these addresses are located in Innisfil, Ontario.

35.   Police Constable Warren HARRIS #113 and Police Constable Morgan RUSSELL #133 are both members of the South Simcoe Police Service. The South Simcoe Police Service is responsible for policing an area in Ontario north of Toronto, which includes the City of Innisfil.

    a.     On Wednesday the 21st of February, 2007 at about 7:00pm in response to Detective Constable MANHERZ's request Police Constable HARRIS and Police Constable RUSSELL attended 1084 Kensington Ave in Innisfil in attempt to locate the accused.

    b.     Once on scene at 1084 Kensington Ave, Police Constable HARRIS and Police Constable RUSSELL, spoke to an occupant of the dwelling identified as Jeff RICHARDS.

    c.     Initially Jeff RICHARDS denied knowing the accused; however, while police were speaking with him his mother Paulette RICHARDS called on the phone.

    d.     Police Constable HARRIS spoke with a female on the telephone who identified

herself as Paulette RICHARDS the accused's mother. Paulette RICHARDS advised Police Constable HARRIS that her son Anthony REYNOLDS (the accused) was married and living in Tampa, Florida.

e.  Paulette further advised she did not know the accused's address, phone number, workplace or wife's name. Paulette also advised that the accused has not resided at 1084 Kensington Ave. for 11 years.

f.  At this time Jeff RICHARDS advised police that the last time the accused was at the address was around Christmas time 2005.

g.  At about 8:18 pm Police Constable HARRIS and Police Constable RUSSELL attended 2085 Wilson Ave, Inisfill.

h.  At 2085 Wilson Ave Police Constable HARRIS and Police Constable RUSSELL spoke with the occupant who identified himself as Delmore RICHARDS, the accused's uncle.

i.  Delmore RICHARDS advised police that the accused had never resided at this address and had last seen him in early 2006 when he (the accused) had driven up from Florida in a rental Chrysler 3000, and stayed with them for two or three days.

j.  Delmore RICHARDS advised that he had not spoken to the accused for some time but believed he was living in Miami, Florida with his wife and baby, and working as a truck driver.

k.  Delmore RICHARDSadvised officers that he did not have the accused's phone number on hand but would check his records for it.

l.  At about 8:45 pm officers exited the dwelling of 2085 Wilson Ave.

m.  At about 10:02 pm Police Constable HARRIS received a phone call from Delmore RICHARDS who advised he had located a phone number for the accused. Delmore RICHARDS advised the accused's phone number was

#561-329-5535.

n.    Police Constable HARRIS conducted an internet check on the number through the website 411.com. Police Constable HARRIS received information this number was a cellular phone number based in the Palm Beach area of Florida. The carrier information was found to be Bell South Mobility.

36.    On February 22nd 2007 in receipt of the information obtained from the South Simcoe Police Service Detective Constable MANHERZ contacted Detective Sergeant Dan BOWERS. Detective Sergeant Dan BOWERS is the Officer in Charge of the International Fugitive Section of the Canadian Branch of Interpol. This unit is based in Ottawa, Ontario, Canada. Detective Constable MANHERZ requested assistance from the unit in locating the accused.

a.    Detective Constable MANHERZ received information from Detective Sergeant Dan BOWERS (via the U.S. Marshall service and U.S. Immigration) that the Accused is a naturalized American citizen, and has a Florida State commercial driver's licence #R-543-001-77-342-0 which lists a Lakeworth, Florida address.

b.    Detective Constable MANHERZ also received information that the accused has two vehicles registered to him. The first vehicle is a 2003 Acura Florida licence plate#U691YA, and the second vehicle is a 1994 Acura Florida Licence plate #F12OHT.

c.    Detective Constable MANHERZ received a Florida driver's licence photograph (Exhibit "G") of the accused and compared it with his Ontario driver's licence photograph. Detective Constable MANHERZ observed that both photographs were of the same person.

37.    On Monday the 12th of March 2007, as a result of the Production Order executed on Air Canada, I received documents from the Air Canada Reservation System. I examined these documents and discovered the following:

a.    The accused booked a return flight via the internet with Air Canada from Palm

Beach International Airport (PBI) to Lester B. Pearson International Airport in Toronto Canada (YYZ).

b.      The accused booked the flight using his real name of Anthony REYNOLDS with an address of 528 South E Street, Lakeworth, Florida.

c.      The accused provided Air Canada with contact information including a phone #561-214-4691, a Visa Card#4319040008487021X0708, and two e-mail addresses PRENNIEKAT@YAHOO.com and BABYBOY_559@HOTMAIL.com

d.      The accused's initial travel itinerary was Air Canada Flight #937 from Palm Beach International Airport departing on the 25th of November 2005, to Lester B. Pearson International Airport. The accused was booked to return on Air Canada Flight #936 departing from Lester B. Pearson International Airport on the 5th of December to Palm Beach International Airport.

e.      The Air Canada Reservation documents showed that the accused changed his return flight date to Palm Beach, Florida originally scheduled for the 5th of December 2005 to December 23rd 2005.

f.      The new flight was Air Canada Flight #936 departing from Lester B. Pearson Airport to Palm Beach International Airport in Florida on December 23rd, 2005.

g.      I examined the flight manifest and confirmed that the accused boarded Air Canada flight #936 from Lester B. Pearson Airport to Palm Beach International Airport on December 23rd, 2005. The accused was assigned seat #24C.

h.      I conducted a check on the phone number provided to Air Canada by the accused using internet website yellowpages.com. The phone #561-214-4691 was listed as registered to a Verizon Wireless cellular phone. The subscriber to this phone is listed as Randy Yacuzzo with an address of 1598 Newhaven Point Line, Royal Palm Beach, Florida 33411.

32

38.    On Sunday the 9th of December 2007, I received a phone call from Officer Danial Mattina of the Department of Homeland Security. Officer Mattina works in the Fort Lauderdale Airport and advised me of the following:

> a.    Officer Mattina advised that Anthony Reynolds returned to Fort Lauderdale Airport on a flight from Kingston, Jamaica.

> b.    Officer Mattina advised that he was detaining Anthony Reynolds at the Airport, on information in regards to charges he was facing in Canada.

> c.    I advised Officer Mattina that I was obtaining an extradition warrant for Anthony Reynolds return to Canada but it was not yet in effect.

> d.    I sent a photograph of Anthony Reynolds to Officer Mattina who confirmed it was the same person who he was detaining.

> e.    I advised Officer Mattina that Anthony Reynolds could be released pending the issuance of the extradition order.

> f.    Officer Mattina advised he would be releasing the accused.

39.    In March 2008, I received information from INTERPOL reconfirming REYNOLDS' Florida address.

**D.    ANTHONY REYNOLDS' WHEREABOUTS**

40.    As set out above

> a.    I believe that after shooting the victim, the accused on December 23rd, 2005, at 9:38 am fled the country on Air Canada Flight #936 bound for West Palm Beach, Florida, United States of America. This information has been confirmed by the flight records and manifest obtained under the authority of a *Criminal Code of Canada* Production Order.

> b.    I believe that the accused is currently residing in Florida, both from statements

33

made by the accused's family and the fact the accused is a naturalized American Citizen. The accused also has a Florida State driver's licence and two vehicles registered to him with Florida licence plates attached.

41.    That I make this Affidavit in support of Canada's request for extradition of Anthony REYNOLDS and for no improper purpose or motive.


SWORN BEFORE ME at the            )
City of Toronto, in the Province of    )
Ontario, Canada, this ___16th___ day    )
of ___June___, 2008 )        DARREN TOWNLEY


_____
A Commissioner for taking oaths etc.
Janet Gallin
Counsel, Crown Law Office - Criminal.

# EXHIBIT "A"

# Certified Copy of Information

THIS IS EXHIBIT ___A___ TO THE
AFFIDAVIT OF Darren Townley
SWORN BEFORE ME
THIS 16th DAY OF June 2008

A Commissioner, etc.

CANADA
PROVINCE OF ONTARIO
PROVINCE DE L'ONTARIO

TORONTO REGION
*RÉGION DE TORONTO*

}

Information of ............................................................
*Dénonciation de:* Darren TOWNLE

of/de ...Toronto.Police.Service.................................

Peace Officer ................................................

*(occupation/profession)*

The informant says
*Le dénonciateur*

that he/she believes on reasonable grounds that
*déclare qu'il a des motifs raisonnables de croire que*

(1) Anthony REYNOLDS on or about the 22nd day of December in the year 2005 in the City of Toronto, in the Toronto Region did attempt to murder Felix TWUM by shooting him contrary to the Criminal Code

(2) and further that Anthony REYNOLDS on or about the 22nd day of December in the year 2005 in the City of Toronto, in the Toronto Region did attempt to murder Felix TWUM while using a firearm by shooting him contrary to the Criminal Code

(3) and further that Anthony REYNOLDS on or about the 22nd day of December in the year 2005 in the City of Toronto, in the Toronto Region did maim Felix TWUM thereby committing an aggravated assault contrary to the Criminal Code

(4) and further that Anthony REYNOLDS on or about the 22nd day of December in the year 2005 in the City of Toronto, in the Toronto Region with intent to endanger the life of Felix TWUM discharge a firearm at Felix TWUM contrary to the Criminal Code

(5) and further that Anthony REYNOLDS on or about the 22nd day of December in the year 2005 in the City of Toronto, in the Toronto Region did in committing an assault on Felix TWUM carry a weapon to wit a firearm. contrary to the Criminal Code

(6) and further that Anthony REYNOLDS on or about the 22nd day of December in the year 2005 in the City of Toronto, in the Toronto Region did have in his possession a restricted weapon, to wit a 9 millimeter handgun for which he did not have a registration certificate issued to him contrary to the Criminal Code

(7) and further that Anthony REYNOLDS on or about the 22nd day of December in the year 2005 in the City of Toronto, in the Toronto Region did without lawful excuse point a firearm to wit a handgun at Felix TWUM contrary to the Criminal Code

(8) and further that Anthony REYNOLDS on or about the 22nd day of December in the year 2005 in the City of Toronto, in the Toronto Region was an occupant of a motor vehicle, to wit a black sports utility vehicle in which he knew that there was at that time a restricted weapon, to wit a 9 millimeter handgun CONTRARY TO THE CRIMINAL CODE.

(9) and further that Anthony REYNOLDS on or about the 7th day of December in the year 2005 in the City of Toronto, in the Toronto Region did by deceit, falsehood or other fraudulent means attempt to defraud The Toronto Dominion Bank of thirteen thousand three hundread and twenty four dollars and fifty seven cents of a value which exceeded five thousand dollars contrary to the Criminal Code.

CERTIFIED TO BE A TRUE AND
CORRECT COPY OF THE ORIGINAL
COPIE AUTHENTIQUE CERTIFIEE
ET CONFORME A L'ORIGINAL

APR 2 3 2007

CLERK OF THE COURT
ONTARIO COURT OF JUSTICE
GREFFIER DE LA COUR
COUR DE JUSTICE DE L'ONTARIO

OFFICE FOR DISABILITY ISSUES   OFFICE DES AFFAIRES DES PERSONNES HANDICAPÉES
INFORMATION SERVICES FOR BARRIER FREE COURTS   SERVICE D'INFORMATION SUR LES TRIBUNAUX À ACCÈS FACILE
1-800-387-4456   1-800-387-4456
TORONTO AREA 326-0111   RÉGION DE TORONTO 326-0111

(C 0935 (rev. 06-93)   (Long Form - One or More Accsd.
*Formule complete - Un ou plusieurs prévenus)*

(Continued on page No. 2 within)
*(Suite à la page 2 ci-incluse)*

Page "A"

| Date | Accused | Appears Adjournment (Remand to) | Parties Consent | Bail and/or other action | Fails to appear | Bench Warrant | Fails to appear | Fails to appear |
|------|---------|--------------------------------|-----------------|--------------------------|-----------------|---------------|-----------------|-----------------|
| Date | Accusé(e) | Comparution Ajournement (Renvoi) | Consentement des parties | Cautionnement et/ou autre mesure | Omet de comparaître | Mandat du tribunal | Omet de comparaître | Omet de comparaître |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |

| Date | Clerk | Reporter | For Crown | For Accused |
|------|-------|----------|-----------|-------------|
| Date | Greffier | Sténographe | pour la Couronne | pour l'accusé(e) |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | Accused/Accusé(e) | | Notice Given Under H.T.A. Avis en vertu du Code de la route | Z 154(3) Imprd. |

Sworn before me at the City of Toronto, in the Toronto Region / Déclaré sous serment à moi dans la Ville de Toronto, dans la Région de Toronto (Continued)/ Page No. 2 (Suite)/ Page n° 24

Filed 07/09/2008    Page 100 of 124

Déclaré sous _____
this _____
Je        4

day of _____
jour de        Ma y

YYYY

2006

A Justice of the Peace in and for the Province of Ontario/Juge de paix dans et pour la province de l'Ontario

Informant/Dénonciateur

| Appearance Notice/<br>Citation à comparaître | Promise to Appear/<br>Promesse de comparaître | Recognizance for<br>Engagement pour le ........................<br>YYYY | Confirmed on<br>Confirmé(e) le ........................<br>YYYY          J.P. |
|---|---|---|---|

| Date<br>Date | Crown Elects to Proceed<br>Choix de la Couronne | Summarily<br>Procédure sommaire | | | | By Indictment<br>Mise en accusation | Summary Conviction Offence(s)<br>Infraction punissable sur déclaration de culpabilité par procédure |
|---|---|---|---|---|---|---|---|

| Date<br>Date | Accused<br>Accusé(e) | Elects Trial by/Choix d'un procès devant | | | Abs.<br>Juris.<br>Jurid.<br>abs. | Pleads/Plaidoyer | |
|---|---|---|---|---|---|---|---|
| | | Gen. Division<br>générale | Provincial Division/provinciale | | | Guilty to Counts/<br>coupable pour les chefs<br>d'accusation | Not Guilty to Counts/<br>non coupable pour les chefs<br>d'accusation |
| | | Judge<br>Juge | Judge &<br>Jury/Juge<br>et jury | Judge on Counts<br>Juge pour les chefs<br>d'accusation | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |

| | | Committed (or) Ord. Std.<br>Trial *On Counts<br>renvoyé à son procès (ou)<br>astreint en jugement *pour<br>les chefs d'accusation | Bail<br>Cautionnement | Discharged<br>on Counts<br>libéré(e) pour les<br>chefs d'accusation | Found Guilty<br>on Counts<br>reconnu(e) coupable<br>pour les chefs<br>d'accusation | Not Guilty on Counts<br>Non coupable pour les<br>chefs d'accusation |
|---|---|---|---|---|---|---|
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |

With consent of accused and prosecutor, without taking or recording
Avec le consentement de l'accusé(e) et du poursuivant sans recueillir ou consigner

(a) any evidence(or)
(a) de preuve (ou)

(b) further evidence
(b) de preuve
supplémentaire

CERTIFIED TO BE A TRUE AND
CORRECT COPY OF THE ORIGINAL
COPIE AUTHENTIQUE CERTIFIÉE
ET CONFORME A L'ORIGINAL

APR 2 3 2007

CLERK OF THE COURT
ONTARIO COURT OF JUSTICE
GREFFIER DE LA COUR
COUR DE JUSTICE DE L'ONTARIO

Judge/Juge

06/40 052811

---

**Section 1 (TOWNLEY Dana Dat)**

Informant
Dénonciateur    TOWNLEY Dana Dat 12472

Date Sworn
Date d'assermentation

Officer
Agent de police    TOWNLEY    No./N° 12472

Div.
Div.    31    Dist.
Dist.    3

File No.
N° du dossier

Return Date of Summons
Sommation rapportée le                    YYYY

INFORMATION Against

CHARGE:/ACCUSATION:

| ☐ Summons / Sommation | ☐ Warrant / Mandat | ☐ Arrest / Arrestation |
|---|---|---|

☐ Reportable M.V. Offence (H.T.A. 210)
Rapport V.M. (Code de la route 210)    C.V.O.R. No. (Commercial Vehicles Only)
Numéro I.V.U.O. (véhicles utilitaires seulement)

| Sex/Sexe | Birth Date/Date de naissance Day/Jour | Month/Mois | Year/Année | Was defendant owner? Le défendeur était-il propriétaire? Yes/Oui No/Non |
|---|---|---|---|---|

Driver's Licence Number/Numéro du permis de conduire

Plate No./Numéro de plaque    ☐ Involves an Accident / Infraction reliée à un accident

Courtroom:
Salle d'audience:

AUA

---

**Section 2 (middle)**

File No.
N° du dossier

Return Date of Summons
Sommation rapportée le                    YYYY

INFORMATION Against

CHARGE:/ACCUSATION:

| ☐ Summons / Sommation | ☐ Warrant / Mandat | ☐ Arrest / Arrestation |
|---|---|---|

☐ Reportable M.V. Offence (H.T.A. 210)
Rapport V.M. (Code de la route 210)    C.V.O.R. No. (Commercial Vehicles Only)
Numéro I.V.U.O. (véhicles utilitaires seulement)

| Sex/Sexe | Birth Date/Date de naissance Day/Jour | Month/Mois | Year/Année | Was defendant owner? Le défendeur était-il propriétaire? Yes/Oui No/Non |
|---|---|---|---|---|

Driver's Licence Number/Numéro du permis de conduire

Plate No./Numéro de plaque    ☐ Involves an Accident / Infraction reliée à un accident

Courtroom:
Salle d'audience:

AUA

---

**Section 3 (ANTHONY REYNOLDS)**

File No.
N° du dossier

Return Date of Summons
Sommation rapportée le                    YYYY

INFORMATION Against

ANTHONY REYNOLDS

CHARGE:/ACCUSATION:

See attached Appendix A

| ☐ Summons / Sommation | ☒ Warrant / Mandat | ☐ Arrest / Arrestation |
|---|---|---|

☐ Reportable M.V. Offence (H.T.A. 210)
Rapport V.M. (Code de la route 210)    C.V.O.R. No. (Commercial Vehicles Only)
Numéro I.V.U.O. (véhicles utilitaires seulement)

| Sex/Sexe | Birth Date/Date de naissance Day/Jour | Month/Mois | Year/Année | Was defendant owner? Le défendeur était-il propriétaire? Yes/Oui No/Non |
|---|---|---|---|---|
| M. | 22 | Sep | 1977 | |

Driver's Licence Number/Numéro du permis de conduire

Plate No./Numéro de plaque    ☐ Involves an Accident / Infraction reliée à un accident

Courtroom:
Salle d'audience:

AUA

| Accused Name and Address | DOB | SEX |
|---|---|---|
| REYNOLDS, ANTHONY | 1977.09.22 | M |

Officer

===================================================================================

| Count | Charge | Offence Date |
|---|---|---|
| | =================================================================== | |
| 1 | Attempted murder C.C. 239 | 2005.12.22 |
| 2 | Attempted murder while using a firearm C.C. 239(a) | 2005.12.22 |
| 3 | Aggravated assault C.C. 268 | 2005.12.22 |
| 4 | Discharge firearm endanger life C.C. 244(b) | 2005.12.22 |
| 5 | Assault with weapon C.C. 267(a) | 2005.12.22 |
| 6 | Possession of unregistered restricted weapon C.C. 91(1) | 2005.12.22 |
| 7 | Pointing a Firearm C.C. 86(1) | 2005.12.22 |
| 8 | Unauthorized presence of a firearm in a motor vehicle (1999) C.C. Section 94(1) | 2005.12.22 |
| 9 | Attempt Fraud Over C.C. 380(1)(a) | 2005.12.07 |

Total of 9 charges for accused REYNOLDS, ANTHONY

CERTIFIED TO BE A TRUE AND
CORRECT COPY OF THE ORIGINAL
COPIE AUTHENTIQUE CERTIFIEE
ET CONFORME A L'ORIGINAL

APR 2 3 2007

CLERK OF THE COURT
ONTARIO COURT OF JUSTICE
GREFFIER DE LA COUR
COUR DE JUSTICE DE L'ONTARIO

# APPENDIX "A"

1) Attempted Murder C.C 239
2) Attempted Murder While using a   Firearm  C.C 239(a)
3) Aggravated Assault C.C 268
4) Discharge Firearm Endanger Life C.C 244(b)
5) Assault With a Weapon C.C 267(a)
6) Possession of an Unregistered Restricted Weapon C.C  91(1)
7) Pointing a Firearm C.C 86(1)
8) Unauthorized Presence of a Firearm in a Motor Vehicle C.C 94(1)
9) Attempt Fraud Over C.C 380(1)(a)

# EXHIBIT "B"

# Warrant in the First Instance

THIS IS EXHIBIT ___B___ TO THE
AFFIDAVIT OF _Durren Townley_
SWORN BEFORE ME
THIS _16th_ DAY OF _June_ 20_08_

_____
A Commissioner, etc.

CANADA
PROVINCE OF ONTARIO
TORONTO REGION

}

**Warrant for Arrest**

Form 7
Sections 475, 493, 597, 800, 803

To the Peace Officers in the said Region
and in the Province of Ontario:

This warrant is issued for the arrest of  Anthony REYNOLDS                    1977/09/22
                                          (Name)                          (Date of Birth - YYYY/MM/DD)

of  No fixed address
                                    (Address)

of the  City of Toronto
                        (City)                            hereinafter, called the accused.

WHEREAS the accused has been charged that he/she,  on December 22nd, 2006

at the City of Toronto, in the said Region, (Set out briefly the offence in respect of which the accused is charged)

see appendix "A"

contrary to the Criminal Code.

AND WHEREAS

*Informant's Initials*

(a)  there are reasonable grounds to believe that it is necessary in the public interest to issue this warrant for the arrest of the accused (507(4), 512(1));

(b)  the accused failed to attend court in accordance with the summons served upon him/her. (512(2));

(c)  (an appearance notice or a promise to appear or a recognizance entered into before an officer in charge) was confirmed and the accused failed to attend court in accordance therewith (512(2));

(d)  it appears that a summons cannot be served because the accused is evading service (512(2));

(e)  the accused was ordered to be present at the hearing of an application for a review of an order made by a justice and did not attend the hearing (520(5), 521(5));

(f)  there are reasonable grounds to believe that the accused has contravened or is about to contravene the (promise to appear or undertaking or recognizance) on which he/she was released (524(1), 525(5), 679(6));

(g)  there are reasonable grounds to believe that the accused has since his/her release from custody on (a promise to appear or an undertaking or a recognizance) committed an indictable offence (524(1), 525(5), 679(6));

(h)  the accused was required by an (appearance notice or a promise to appear or a recognizance entered into before an officer in charge or a summons) to attend at a time and place stated therein for the purposes of the *Identification of Criminals Act* and did not appear at that time and place (502, 510);

(i)  an indictment has been found against the accused and the accused has not appeared or remained in attendance before the court for his/her trial (597);

(j)  for any case not covered above, insert recital in the words of the statute authorizing the warrant:

This is, therefore, to command you, in Her Majesty's name, forthwith to arrest the said accused and to bring him/her before the Presiding Judge of the Ontario Court of Justice of the Toronto Region or before me or any justice in and for the said Region, to be dealt with according to law.

Dated this  4th  day of  MAY            , 2006

at the City of Toronto, in the Toronto Region.

_____
Judge, Clerk of the Court, Provincial Court Judge or Justice

STEVEN WAISBERG
JUSTICE OF THE PEACE

TPS Form 7 (Adult)  (2002/11)

## AUTHORIZATION TO ENTER A DWELLING HOUSE

WHEREAS there are reasonable grounds to believe that the accused is or will be present in *(describe dwelling-house(s)):*

_____
*(Address(es))*

This warrant is issued to authorize you to enter the dwelling-house(s) for the purpose of arresting or

apprehending the accused at any time between the hour of _____ ○ a.m. ○ p.m., on the _____

day of _____, _____ and the hour of _____ ○ a.m. ○ p.m., on the _____

day of _____, _____, subject to the condition that you may not enter the

unless you have, immediately before entering the dwelling-house(s), reasonable grounds to believe that the person to be arrested or apprehended is present in the dwelling-house(s).

AND WHEREAS there are reasonable grounds to believe that prior announcement of the entry would:

_____  (a)    expose the peace officer or any other person to imminent bodily harm or death; or
Informant's Initials

_____  (b)    result in the imminent loss or imminent destruction of evidence relating to the commission of
                        an indictable offence.

This warrant is also issued to authorize you to enter the dwelling-house(s) without prior announcement, subject to the condition that you may not enter the dwelling-house(s) without prior announcement unless you have, immediately before entering the dwelling-house(s),

    (a)    reasonable grounds to suspect that prior announcement of the entry would expose the peace officer or any other person to imminent bodily harm or death; or

    (b)    reasonable grounds to believe that prior announcement of the entry would result in the imminent loss or imminent destruction of evidence relating to the commission of an indictable offence.

The authorization to enter the dwelling-house(s) for the purpose of arresting or apprehending the accused shall be carried out in accordance with the following terms and conditions *(specify)*:




Dated this _____ day of _____ , _____
at the City of Toronto, in the Toronto Region.

_____
Judge, Clerk of the Court, Provincial Court Judge or Justice

_____

Form 28
(Section 528)

### ENDORSEMENT OF WARRANT

CANADA
PROVINCE OF ONTARIO

_____

Pursuant to application this day made to me, I hereby authorize the arrest of the

accused (or defendant) within the _____.
                                              *(Region)*

DATED this _____ day of _____ , _____

_____
Judge (or) Justice of the Peace in and for the Province of Ontario

_____

Form 29
(Section 507)

### ENDORSEMENT OF WARRANT

CANADA
PROVINCE OF ONTARIO

_____

Whereas this warrant is issued under section 507, 508 or 512 of the Criminal Code in respect of an

offence other than an offence mentioned in section 522 of the Criminal Code, I hereby authorize the

release of the accused pursuant to Section 499 of that Act.

DATED this _____ day of _____ , _____

at the City of Toronto, in the Toronto Region.

TPS Form 7 (Adult)   (2002/11)            _____
                                              A Justice of the Peace in and for the Province of Ontario

**Warrant for Arrest**

Form 7
Sections 475, 493, 597, 800, 803

CANADA
PROVINCE OF ONTARIO

TORONTO REGION

To the Peace Officers in the said Region
and in the Province of Ontario:

This warrant is issued for the arrest of  Anthony REYNOLDS                    1977/09/22
                                                    *(Name)*                           *(Date of Birth -YYYY/MM/DD)*

of  No fixed address
                                              *(Address)*

of the  City of Toronto                                    hereinafter called the accused.
                    *(City)*

WHEREAS the accused has been charged that he/she,  on December 22nd, 2008

at the City of Toronto, in the said Region, *(Set out briefly the offence in respect of which the accused is charged)*

    see appendix "A"

contrary to the Criminal Code.

AND WHEREAS

*Informant's initials*

(a) there are reasonable grounds to believe that it is necessary in the public interest to issue this warrant for the arrest of the accused (507(4), 512(1));

_____ (b) the accused failed to attend court in accordance with the summons served upon him/her (512(2));

_____ (c) (an appearance notice or a promise to appear or a recognizance entered into before an officer in charge) was confirmed and the accused failed to attend court in accordance therewith (512(2));

_____ (d) it appears that a summons cannot be served because the accused is evading service (512(2));

_____ (e) the accused was ordered to be present at the hearing of an application for a review of an order made by a justice and did not attend the hearing (520(5), 521(5));

_____ (f) there are reasonable grounds to believe that the accused has contravened or is about to contravene the (promise to appear or undertaking or recognizance) on which he/she was released (524(1), 525(5), 679(6));

_____ (g) there are reasonable grounds to believe that the accused has since his/her release from custody on (a promise to appear or an undertaking or a recognizance) committed an indictable offence (524(1), 525(5), 679(6));

_____ (h) the accused was required by an (appearance notice or a promise to appear or a recognizance entered into before an officer in charge or a summons) to attend at a time and place stated therein for the purposes of the *Identification of Criminals Act* and did not appear at that time and place (502, 510);

_____ (i) an indictment has been found against the accused and the accused has not appeared or remained in attendance before the court for his/her trial (597);

_____ (j) for any case not covered above, insert recital in the words of the statute authorizing the warrant:

This is, therefore, to command you, in Her Majesty's name, forthwith to arrest the said accused and to bring him/her before the Presiding Judge of the Ontario Court of Justice of the Toronto Region or before me or any justice in and for the said Region, to be dealt with according to law.

Dated this  4th  day of  MAY                    2006.

at the City of Toronto, in the Toronto Region.

_____
Judge, Clerk of the Court, Provincial Court Judge or Justice

STEPHEN WAISBERG
JUSTICE OF THE PEACE

TPS Form 7 (Adult)  (2002/11)

## APPENDIX "A"

1) Attempted Murder C.C 239
2) Attempted Murder While using a   Firearm  C.C 239(a)
3) Aggravated Assault C.C 268
4) Discharge Firearm Endanger Life C.C 244(b)
5) Assault With a Weapon C.C 267(a)
6) Possession of an Unregistered Restricted Weapon C.C  91(1)
7) Pointing a Firearm C.C 86(1)
8) Unauthorized Presence of a Firearm in a Motor Vehicle C.C 94(1)
9) Attempt Fraud Over C.C 380(1)(a)



# EXHIBIT "C"

# Third Information Sworn,
# May 2, 2008

THIS IS EXHIBIT _____ "C" _____ TO THE
AFFIDAVIT OF _Darren Townley_
SWORN BEFORE ME
THIS _16_ th DAY OF _June_ 20 _08_

A Commissioner, etc.

CANADA
PROVINCE OF ONTARIO
PROVINCE DE L'ONTARIO

TORONTO REGION
*RÉGION DE TORONTO*

Information of
*Dénonciation de:*

of/de     **Toronto Police Service**

            **Peace Officer**                                         The informant says
                    (occupation/profession)                          *Le dénonciateur*

that he/she believes on reasonable grounds that
*déclare qu'il a des motifs raisonnables de croire que*

(1)   Anthony REYNOLDS on or about the 22nd day of December in the year 2005 in the City of Toronto, in the Toronto Region did attempt to murder Felix TWUM by shooting him contrary to the Criminal Code

(2)   and further that Anthony REYNOLDS on or about the 22nd day of December in the year 2005 in the City of Toronto, in the Toronto Region did attempt to murder Felix TWUM while using a firearm by shooting him contrary to the Criminal Code

(3)   and further that Anthony REYNOLDS on or about the 22nd day of December in the year 2005 in the City of Toronto, in the Toronto Region did maim Felix TWUM thereby committing an aggravated assault contrary to the Criminal Code

(4)   and further that Anthony REYNOLDS on or about the 22nd day of December in the year 2005 in the City of Toronto, in the Toronto Region with intent to endanger the life of Felix TWUM discharge a firearm at Felix TWUM contrary to the Criminal Code

(5)   and further that Anthony REYNOLDS on or about the 22nd day of December in the year 2005 in the City of Toronto, in the Toronto Region did in committing an assault on Felix TWUM use a weapon to wit a firearm. contrary to the Criminal Code

(6)   and further that Anthony REYNOLDS on or about the 22nd day of December in the year 2005 in the City of Toronto, in the Toronto Region did, without lawful excuse, point a firearm, to wit, a handgun, at Felix TWUM, CONTRARY TO THE CRIMINAL CODE OF CANADA.

(7)   and further that Anthony REYNOLDS on or about the 22nd day of December in the year 2005 in the City of Toronto, in the Toronto Region , did use a firearm to wit a handgun while committing the indictable offence of  Aggravated Assault, contrary to the Criminal Code.

(8)   and further that Anthony REYNOLDS on or about the 22nd day of December in the year 2005 in the City of Toronto, in the Toronto Region , did use a firearm to wit a handgun while committing the indictable offence of Assault with a Weapon, contrary to the Criminal Code.

MAY 0 2 2008

A. Frederici

(Long Form - One or More Accsd. /
*Formule complète - Un ou plusieurs prévenus)*

YC 0935 (rev. 05/2008)

(Continued on page No. 2 within)
*(Suite à la page 2 ci-inclus)*

☐ Interpreter / Interprète ..................................................

## APPEARANCES - ADJOURNMENTS
### *COMPARUTIONS - AJOURNEMENTS*

Page "A"

| Date / *Date* | Accused / *Accusé(e)* | Adjournment / *Ajournement* | Parties Consent / *Consentement des parties* | Appearance Details / *Détails de la comparution* | Counsel as Agent / *Avocat(e) mandataire* | Fails to appear / *Droit de comparaître* | Bench Warrant / *Mandat du tribunal* | Discretion / *Discrétion* | Certificate of Default / *Certificat de défaut* |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |

| Date / *Date* | Clerk / *Greffier* | Reporter / *Sténographe* | For Crown / *pour la Couronne* | For Accused / *pour l'accusé(e)* | Justice's Initials / *Itiales du juge de paix* |
|---|---|---|---|---|---|
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

| Accused/*Accusé(e)* | Notice Given Under H.T.A. / *Avis en vertu du Code de la route* | ☐ Suspension / *Suspension* | ☐ Impoundment / *Mise en fourrière* |
|---|---|---|---|

YC 0935 (rev. 05/2006)

Sworn before me at the City of Toronto, in the Province of Ontario
*Déclaré sous serment dans la Ville de Toronto, dans la province de l'Ontario*

this ___ day of _____ , yr. _____
*ce _____ jour de _____ , an _____*

_____ Informant/*Dénonciateur*

_____
Justice of the Peace / *Juge de paix*

| | | | |
|---|---|---|---|
| ☐ Appearance Notice/ *Citation à comparaître* | ☐ Promise to Appear/ *Promesse de comparaître* | ☐ Recognizance for _____ , yr. ___ *Engagement pour le* _____ , an ___ | |

☐ Publication ban pursuant to
*Interdiction de publication en vertu de* _____

☐ Confirmed on _____ , yr. ___
*Confirmé(e) le* _____ , an ___

_____
Justice of the Peace
*Juge de paix*

| Date *Date* | Crown Elects to Proceed *Choix de la Couronne* | ☐ Summarily *Procédure sommaire* | ☐ By Indictment *Mise en accusation* | ☐ Summary Conviction Offence(s) *Infraction punissable sur déclaration de culpabilité par procédure sommaire* | ☐ Indictable Offence(s) *Infraction punissable par mise en accusation* |
|---|---|---|---|---|---|

| Date *Date* | Accused *Accusé(e)* | Elects Trial by/*Choix d'un procès devant* | | | Preliminary Hearing Requested *Enquête préliminaire demandée* | | Justice's Initials *Initiales du juge* | Abs. Juris. *Abs. Jurid.* | Pleads/*Plaidoyer* | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | Superior Court/ *Cour supérieure* | | Ontario Court *Cour de l'Ontario* | Yes *Oui* | No *Non* | | | Guilty to Count(s) *coupable pour les chefs d'accusation* | Not Guilty to Count(s) *non coupable pour les chefs d'accusation* |
| | | Judge *Juge* | Judge & Jury/*Juge et jury* | Judge on Counts *Juge pour les chefs d'accusation* | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |

| Date *Date* | Accused *Accusé(e)* | Committed (or) Ord. Std. Trial *On Counts Interné(e) (ou) renvoyé à son procès * pour les chefs d'accusation* | Discharged on Counts *libéré(e) pour les chefs d'accusation* | Found Guilty on Counts *reconnu(e) coupable pour les chefs d'accusation* | Not Guilty on Counts *Non coupable pour les chefs d'accusation* |
|---|---|---|---|---|---|
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

* ☐ With consent of accused and prosecutor, without taking or recording
*Avec le consentement de l'accusé(e) et du poursuivant sans recueillir ou consigner*

☐ (a) any evidence(or) *(a) de preuve (ou)*  (or)/*(ou)*  ☐ (b) further evidence *(b) de preuve supplémentaire*

MAY 0 2 2008
A. Frederick

_____
Judge/*Juge*

☐ Victim Surcharge $ _____
*Suramende compensatoire*

Time to Pay $ _____
*Délai de paiement*

Informant / *Dénonciateur* G. Smolenski

Date Sworn / *Date d'assermentation* May 02 2008

Officer / *Agent de police* Townsley   No. / *No.* 5757 1A/72

Div. / *Div.* 31   Dist. / *Dist.*

---

**No. of Information / Nº de la dénonciation**

Return Date of Summons / *Sommation rapportée le*
_____ yr./ _____
_____ an

**INFORMATION Against / DÉNONCIATION visant**

**Address/Adress**

**CHARGE:/ACCUSATION:**

| | | | | | |
|---|---|---|---|---|---|
| ☐ Summons ☐ Sommation | ☐ Show Cause ☐ Audience de justification | ☐ Warrant 1st ☐ Mandat en 1re instance | ☐ Relayed Information ☐ Dénonciation déposée de nouveau | | |
| ☐ Reportable M.V. Offence (H.T.A. 199) *Rapport V.M. (Code de la route 199)* | | | ☐ C.V.O.R. No. (Commercial Vehicles Only) *Numéro C.E.C.V.U. (véhicles utilitaires seulement)* | | |
| Sex *Sexe* | Birth Date/*Date de naissance* Day/*Jour* Month/*Mois* Year/*Année* | | Was defendant owner? *Le défendeur était-il propriétaire?* ☐ Yes/Oui ☐ No/Non | | |
| Driver's Licence Number/*Numéro du permis de conduire* | | | | | |
| Plate No./*Numéro de plaque* | Informant *Dénonciateur* | | ☐ Involves a Collision *Infraction reliée à un accident* | | |
| Courtroom *Salle d'audience* | | | | | |
| At/*À(Au)* | | | | | |

---

**No. of Information / Nº de la dénonciation**

Return Date of Summons / *Sommation rapportée le*
_____ yr./ _____
_____ an

**INFORMATION Against / DÉNONCIATION visant**

**Address/Adress**

**CHARGE:/ACCUSATION:**

| | | | | | |
|---|---|---|---|---|---|
| ☐ Summons ☐ Sommation | ☐ Show Cause ☐ Audience de justification | ☐ Warrant 1st ☐ Mandat en 1re instance | ☐ Relayed Information ☐ Dénonciation déposée de nouveau | | |
| ☐ Reportable M.V. Offence (H.T.A. 199) *Rapport V.M. (Code de la route 199)* | | | ☐ C.V.O.R. No. (Commercial Vehicles Only) *Numéro C.E.C.V.U. (véhicles utilitaires seulement)* | | |
| Sex *Sexe* | Birth Date/*Date de naissance* Day/*Jour* Month/*Mois* Year/*Année* | | Was defendant owner? *Le défendeur était-il propriétaire?* ☐ Yes/Oui ☐ No/Non | | |
| Driver's Licence Number/*Numéro du permis de conduire* | | | | | |
| Plate No./*Numéro de plaque* | | | ☐ Involves a Collision *Infraction reliée à un accident* | | |
| Courtroom *Salle d'audience* | | | | | |
| At/*À(Au)* | | | | | |

---

**No. of Information / Nº de la dénonciation**

Return Date of Summons / *Sommation rapportée le*
_____ yr./ _____
_____ an

**INFORMATION Against / DÉNONCIATION visant**

ANTHONY REYNOLDS

**Address/Adress**

**CHARGE:/ACCUSATION:**

See attached Appendix A

| | | | | | |
|---|---|---|---|---|---|
| ☐ Summons ☐ Sommation | ☐ Show Cause ☐ Audience de justification | ☐ Warrant 1st ☐ Mandat en 1re instance | ☐ Relayed Information ☐ Dénonciation déposée de nouveau | | |
| ☐ Reportable M.V. Offence (H.T.A. 199) *Rapport V.M. (Code de la route 199)* | | | ☐ C.V.O.R. No. (Commercial Vehicles Only) *Numéro C.E.C.V.U. (véhicles utilitaires seulement)* | | |
| Sex *Sexe* M | Birth Date/*Date de naissance* Day/*Jour* 22 Month/*Mois* Sep Year/*Année* 1977 | | Was defendant owner? *Le défendeur était-il propriétaire?* ☐ Yes/Oui ☐ No/Non | | |
| Driver's Licence Number/*Numéro du permis de conduire* | | | | | |
| Plate No./*Numéro de plaque* | | | ☐ Involves a Collision *Infraction reliée à un accident* | | |
| Courtroom *Salle d'audience* | | | | | |
| At/*À(Au)* | | | | | |

YC0935 rev. 05/2006)

Accused Name and Address                                                  DOB      SEX
REYNOLDS, ANTHONY                                                      1977.09.22  M


Officer

=====================================================================================
Count Charge                                                          Offence Date
=====================================================================================
    1   Attempted murder C.C. 239                                        2005.12.22
    2   Attempted murder while using a firearm C.C. 239(a)               2005.12.22
    3   Aggravated assault C.C. 268                                      2005.12.22
    4   Discharge firearm endanger life C.C. 244(b)                      2005.12.22
    5   Assault with weapon C.C. 267(a)                                  2005.12.22
    6   Pointing a firearm C.C. 87(1)                                    2005.12.22
    7   Use Firearm to commit indictable offence C.C. 85(1)(a)           2005.12.22
    8   Use Firearm to commit indictable offence C.C. 85(1)(a)           2005.12.22

Total of 8 charges for accused REYNOLDS, ANTHONY



MAY 0 2 2006
A. Frederick

# EXHIBIT "D"

# Counterfeit Ontario Drivers Licence in name of "Oval Thompson"

THIS IS EXHIBIT ___"D"___ TO THE
AFFIDAVIT OF ___Darren Townley___
SWORN BEFORE ME
THIS ___16th___ DAY OF ___June___ 20 08

_____
A Commissioner, etc.





# EXHIBIT "E"

## Ontario Drivers Licence Photo of
## Accused Anthony REYNOLDS

## Drivers Licence
## #R2988-05317-70922

THIS IS EXHIBIT "E" TO THE
AFFIDAVIT OF _Darren Townley_
SWORN BEFORE ME
THIS _6_ DAY OF _June_ 20_08_

_A Commissioner, etc._



Control  Help

# Image View - Please Acknowledge

REYNOLDS.ANTHONY.A

R2988-05317-70922

Photo Capture Date and Time

2005/11/30 15:24:27

Enter-Continue

Viewing Image Set, CID=MTO257267112

# EXHIBIT "F"

# Toronto Police Photo Line-up

# #06-001014

# Viewed by Felix TWUM

THIS IS EXHIBIT _"F"_ TO THE
AFFIDAVIT OF _Darren Townley_
SWORN BEFORE ME
THIS _16th_ DAY OF _June_ 20 _06_

_____
A Commissioner, etc.

## IDENTIFICATION LINE-UP REPORT

**PHOTOGRAPHIC LINE-UP #** 06-001014 **DATE:** 2006-03-~~26-27~~ 27 *h.c 0767 f.t.*

**WITNESS:** Felix Twum

You are about to be shown a group of photographs in relation to  ___SHOOTING___

σ **Before you view these photographs, I am going to provide you with directions for this procedure:**
- The person(s) who committed the crime may or may not be in this group of photographs.
- You are in no way obligated to select anyone.
- Study each photograph carefully before making any comments.
- Consider that the photographs could be old or new, and the person may appear older or younger.
- A person's appearance may appear altered by changes to their hair style or colour, growing or shaving of facial hair, gaining or losing of body weight, adding or removing of a tattoo or jewellery, or by wearing a form of head dress.
- Facial structures such as nose, eyes, lips, cheek bones and chin usually remain consistent.

**TIME:** 1233

⇒ **QUESTION:** Do you know, or have you seen any of these persons before under any circumstances, if so where and when?

⇒ **RESPONSE:**  *Thats the person that shot me. #3*

Signature of WITNESS _____

Signature of INVESTIGATOR _____

# Toronto Police Service
## Lineup #: 06-001014

2006/03/06 09:07

**Page: 1 of: 1**

**Report Date:** 2006/03/06
**Created By:** 88993

**Printed By:** 88993
**Requested By:** 88993



Date _____ Time _____ Investigator _____ Witness _____

# EXHIBIT "G"

# Florida State Drivers Licence Photo
# of Accused Anthony REYNOLDS

THIS IS EXHIBIT _____ "G" _____ TO THE
AFFIDAVIT OF _Darren Townley_
SWORN BEFORE ME
THIS _16ᵗʰ_ DAY OF _June_ 20 08

_____
A Commissioner, etc.



IN THE MATTER of the request by Canada for
the extradition of Anthony REYNOLDS with
respect to offences under the *Criminal Code of
Canada*

===============================================

## AFFIDAVIT OF DARREN TOWNLEY

===============================================

ONTARIO

MINISTRY OF THE ATTORNEY GENERAL

Crown Law Office – Criminal

720 Bay Street, 10th Floor

Toronto, Ontario

CANADA

M5G 2K1